**KRAFT FOODS COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL
REVENUE,** Respondent
(two cases).
**Nos. 7, 8, Docket Nos. 23224, 23225.**

United States Court of Appeals
Second Circuit.

Argued Dec. 16, 1955.

Decided April 2, 1956.

Norris Darrell, John F. Dooling, Jr., Dean D. Ramstad, New York City (Erwin N. Griswold, Cambridge, Mass., Sullivan & Cromwell, New York City, of counsel), for petitioner.

H. Brian Holland, Asst. Atty. Gen., Hilbert Zarky, Ellis N. Slack, Lee A. Jackson, Harry Baum, Spec. Assts. to the Atty. Gen., for respondent.

Before CLARK, Chief Judge, and MEDINA and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

The sole issue raised by this appeal from a decision of the Tax Court, 1954, 21 T.C. 513, is whether so-called debenture interest payments made by the taxpayer corporation, Kraft Foods Company, to its parent corporation and sole stockholder, National Dairy Products Corporation, during the years 1934 to 1938, inclusive, constituted deductible "interest * * * on indebtedness" within the meaning of Section 23(b) of the Revenue Acts of 1934, 1936, and 1938, 26 U.S.C.A. (I.R.C.1939) § 23(b). Jurisdiction is conferred on this Court by Section 1141(a) of the Internal Reve-

nue Code of 1939, as amended, 26 U.S. C.A. (I.R.C.1939) § 1141(a).

The material facts, which were stipulated by the parties, may be summarized as follows, insofar as here pertinent.

In May, 1930, National Dairy purchased all the assets of Kraft-Phenix Cheese Corporation for a total consideration of over $81,000,000, and issued $33,264,500 of its own 5¼% debentures to the sellers in part payment. National Dairy then transferred to taxpayer, a Delaware corporation organized in May, 1930, about $72,000,000 worth of these Kraft assets in exchange for all 20,000 shares of taxpayer's par $100 capital stock. Taxpayer opened its books with a stated capital of $2,000,000 and a surplus of $32,381,748 (reflecting the worth of the assets as carried on the books of the seller).

From May, 1930, through the end of 1933, taxpayer earned $11,908,000 and paid dividends of $11,250,000 to its parent, National Dairy. During this period National Dairy and its subsidiaries regularly filed consolidated federal tax returns. On these consolidated returns the earnings of the subsidiaries of National Dairy, including taxpayer, were offset by substantial net losses of National Dairy. These losses were primarily due to the interest charges on National Dairy's large long-term indebtedness—an indebtedness incurred in acquiring the assets subsequently transferred to National Dairy's operating subsidiaries, including taxpayer.

In 1934, when Congress abolished consolidated federal tax returns, taxpayer's board of directors declared a dividend of $30,000,000 "out of the surplus" payable in 6% debentures due February 1, 1948. A concurrent write-up of intangibles increased the total book values of taxpayer's assets from over $34,000,000 to about $47,500,000. It would have been necessary to liquidate a large part of taxpayer's business in order to pay such a substantial dividend in cash, and it is apparent from the circumstances that there was no desire to liquidate any part of the enterprise. Indeed, the corporate resolutions indicate that the dividend was to be paid in debentures in order to preserve the taxpayer's cash position. As required by the resolutions, 30 debentures of $1,000,000 each were issued and delivered to National Dairy. The debentures were simple in form and contained an unconditional promise to pay the principal amount to National Dairy or order on February 1, 1948, with interest from June 30, 1934 at the rate of 6% per annum payable on the first day of each month until maturity. In addition they contained the usual provisions for acceleration of the maturity date in case of insolvency or default in payment of interest. There were no provisions for retirement or amortization of principal.

During the five years (1934–1938) involved in this litigation, petitioner's operations continued to be highly profitable. Although a small portion of petitioner's substantial earnings were retained as surplus, nearly all of taxpayer's earnings found their way to the parent corporation, National Dairy, in the form of interest on the debentures or dividends. The amounts paid as interest on the debentures were $900,000 in 1934 (second half), and $1,800,000 for each of the years 1935 through 1938, a total of $8,100,000. Dividends paid from 1934 through 1938 totaled $17,133,-000.

In January, 1941, taxpayer's president, pointing out that National Dairy by refundings had substantially reduced the interest rate on its own outstanding debentures, asked National Dairy to consent to a reduction of the interest rate on taxpayer's debentures from 6% to 4%. The requested interest reduction was authorized and the debentures were amended accordingly. No payments were made on principal during the stated life of the debentures or at their maturity. When the debentures matured in 1948 they were replaced by a new issue of debentures, still outstanding, bearing interest at 4%.

In its returns for the taxable years 1934 through 1938, taxpayer

claimed as deductions under Section 23 (b) of the applicable Revenue Acts the portions of its earnings paid to National Dairy as interest on the debentures. The Commissioner disallowed the deductions, and the Tax Court, two judges dissenting, sustained the Commissioner's determination. The Tax Court concluded that there was no intent to create a genuine debtor-creditor relationship between taxpayer and its parent, and that the so-called interest payments in reality constituted non-deductible dividend distributions. We think this conclusion of ultimate fact is erroneous, and that where, as here, the evidence consisted of stipulated facts, this Court is entitled to draw its own inferences of ultimate fact from the record.[1]

Taxpayer is a Delaware corporation. Under Delaware law taxpayer was empowered to pay dividends in money or in property to the extent of assets exceeding capital. Laws of Delaware 1929, Ch. 135, § 16, 8 Del.C. §§ 170–172. At the time the dividend was declared, taxpayer's capital was $2,000,000 and its assets had a value, based upon the arm's-length sale less than four years before, of about $72,000,000. Although its book surplus at this time was artificially stated at only about $31,000,000, assets of the magnitude of $70,000,000 supported the dividend. The abundant earning power of taxpayer, already demonstrated in prior years, assured the debt service. Indeed, the Tax Court stated that taxpayer had ample surplus to supply the consideration for the $30,000,000 debenture dividend and had ample substance to support those debentures when issued.

■■■ The declaration of a dividend creates a debtor-creditor relationship between a corporation and its stockhold-ers.[2] In this case taxpayer by regular corporate action properly declared a dividend; it then issued debentures in payment of this dividend. The debentures were of a simple and common form, and contained an unconditional obligation to pay the interest and principal. They contained *all* the necessary features of instruments of indebtedness and *none* of the features ordinarily associated with equity interests. We think it clear that under the applicable law of Delaware these corporate acts merely by their occurrence created legal relations of an enforceable character.

This conclusion is supported by the Tax Court's finding that the purpose of the transaction was to obtain for taxpayer a tax benefit from the interest deductions *which only a valid indebtedness would give rise to.* In other words, taxpayer intended to become indebted because the desired deductions could be secured only if it created genuine indebtedness. The parties were competent to contract a debt; if it was their "purpose" or "intent" to do so, then they succeeded because they performed consciously and purposefully the legal acts that establish a debt.

We have thus far been concerned only with whether the parties intended and created an indebtedness enforceable under state law. We think the parties did all they could have done to establish a debt, and that the Tax Court erred in concluding that the parties had not intended to do what their acts of record clearly indicated they were attempting to accomplish with every means within their power. We now reach the crucial question raised by these appeals: what were the tax consequences, if any, of the events here involved?

1. See Helvering v. Tex-Penn Oil Co., 1937, 300 U.S. 481, 490, 57 S.Ct. 569, 81 L.Ed. 755; Chas. D. Briddell, Inc., v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416, 420; Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537, certiorari denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595; E. H. Sheldon & Co. v. Commissioner, 6 Cir., 1954, 214 F.2d 655, 658–659; Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 1949, 178 F.2d 541, 548.

2. Selly v. Fleming Coal Co., 1935, 7 W.W. Harr. 34, 37 Del. 34, 180 A. 326; Gordon v. Elliman, 1954, 306 N.Y. 456, 459, 119 N.E.2d 331, 334; 11 Fletcher, Cyclopedia of the Law of Private Corporations § 5322 (rev. ed., 1932); Ballantine, Corporations § 235 (rev. ed., 1946).

Section 23(b) of the applicable Revenue Acts provides that in computing net income "there shall be allowed" as a deduction "all interest * * * indebtedness" (with exceptions not pertinent here). The crucial word, of course, is "indebtedness." In general, "The words 'interest on indebtedness' should be accorded their usual, ordinary and every day meaning." Preston v. Commissioner, 2 Cir., 1940, 132 F.2d 763, 765. If they were always accorded that meaning, however, the determination that a particular instrument had created an "indebtedness" enforceable under corporate law would settle conclusively the treatment for federal tax purposes of any payments made pursuant to the instrument. It is now a commonplace that words have many meanings, each dependent upon their context. Thus, "indebtedness" as used in a federal taxation statute may not carry the same meaning as the same word used in the context of corporate finance. As the Supreme Court has said, "although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness' within the meaning of § 23(b)." Deputy v. DuPont, 1940, 308 U.S. 488, 497, 60 S.Ct. 363, 368, 84 L.Ed. 416. Our present problem is whether there is some paramount policy of federal tax law which requires in this case that taxpayer's payments pursuant to its debentures be considered, for tax purposes, as "dividends" rather than "interest * * * on indebtedness."

Numerous cases are concerned with the question whether a particular interest in a corporation is an equity or debt interest. The vast majority of these cases have involved "hybrid securities"—instruments which had some of the characteristics of a conventional debt issue and some of the characteristics of a conventional equity issue. When such hybrid securities are involved the prob-lem of characterization is one of considering each case on all of its facts. See John Kelley Co. v. Commissioner (Talbot Mills v. Commissioner), 1946, 326 U.S. 521, 698, 66 S.Ct. 299, 90 L.Ed. 278. In the present case, however, the instruments involved are entirely conventional in form and contain no ambiguity on their face. In such a case we think the problem is not one of ascertaining "intent," since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes.[3]

Factors in the present case which singly or in combination might be considered to require that the payments pursuant to the debentures be treated as dividends rather than interest are the following: (1) the parent-subsidiary relation; (2) the fact that an initial equity interest was transformed into a purported debt interest; (3) the alleged thin capitalization resulting from the transaction; and (4) the lack of any business purpose other than that of avoiding taxation. The significance and effect of these factors will now be considered.

### 1. Parent-Subsidiary Relation.

Undoubtedly, there are elements in the present case which invite close scrutiny by the Commissioner, among them the fact that the arrangement was made between a parent corporation and its wholly-owned subsidiary. Since the sole stockholder can deal as it pleases with the corporate entity it controls, the transaction is not the result of arm's-length dealing. Consequently, it may be a sham. See Higgins v. Smith, 1941, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. The parent-subsidiary relation also indicates that the earnings of the corporation will wind up in the same hands

---

3. Cf. Gregory v. Helvering, 1935, 293 U. S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., 2 Cir., 1949, 176 F.2d 570, certiorari denied 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589; 1432 Broadway Corp., 1945, 4 T.C. 1158, affirmed per curiam 2 Cir., 1947, 160 F.2d 885.

whatever name the instruments bear. And although the instruments are transferable on their face, there has been no actual transfer and apparently none was intended.

■ However, it is one thing to say that transactions between affiliates should be carefully scrutinized and sham transactions disregarded, and quite a different thing to say that a genuine transaction affecting legal relations should be disregarded for tax purposes merely because it is a transaction between affiliated corporations.[4] We think that to strike down a genuine transaction because of the parent-subsidiary relation would violate the scheme of the statute and depart from the rules of law heretofore governing intercompany transactions.

■ In a broad *economic* sense, of course, it is of limited significance what form a sole stockholder's investment in a wholly-owned corporation takes. That is equally true of any transaction or arrangement between affiliates, whether it be an operating contract, a sale, a lease, or a payment of interest or dividends. But the law generally and the applicable tax law deliberately, through its insistence on taxing affiliates separately, affords significance to and honors the *type* of investment chosen. In consequence, all legitimate and genuine corporation-stockholder arrangements have legal—and hence economic—significance, and must be respected in so far as the rights of third parties, including the tax collector, are concerned.

■ We think that the abolition of consolidated returns in 1934, 48 Stat. 720, 26 U.S.C.A. (I.R.C.1939) § 141 note, should be accorded some significance. For twelve years the Congress had permitted affiliated corporations to choose between being taxed as economic unities on consolidated returns or being taxed as legally distinct entities upon separate returns. In 1934 the option of filing consolidated returns was abolished. Affiliated corporations were required to be taxed as distinct entities. The 1934 Act thus insisted that parent and subsidiary were separate entities and were separately taxable *solely* because they were legalistically distinct. The statutory history of the adoption of consolidated returns in 1918, 40 Stat. 1081,[5] the discussion of proposals to abolish consolidated returns in 1928 and 1932,[6] and the statutory history of the elimination of the consolidated return for all corporations except railroads in 1934[7] all indicate clearly that Congress was aware of the implications of its action. The Congress elected to tax legal entities as such, realizing that in a realistic economic sense affiliated corporations were but departments or branches of single enterprises. We think it is a necessary corollary of this Congressional choice that proper legal transactions among affiliates must be accorded tax recognition even though in a realistic economic sense they have limited significance. As Judge Learned Hand has said, " * * * when a statute is drafted upon a concept like that of the reality of corporate personality, I do not see how that concept can fail to be determinative." Sage v. Commissioner, 2 Cir., 1936, 83 F.2d 221, 225.

■ Moreover, the controlling judicial decisions require recognition of the separate entities of affiliates and of financially sound transactions between affiliates. Where parent and subsidiary, as here, are true corporations conducting their respective businesses as hold-

---

4. A sole stockholder can be, and can enforce the rights of, a creditor. Finn v. George T. Mickle Lumber Co., 9 Cir., 1930, 41 F.2d 676; Wheeler v. Smith, 9 Cir., 1929, 30 F.2d 59. See Ballantine, Corporations § 139 (rev. ed., 1946).

5. Sen.Rep. No. 617, 65th Cong. 3d Sess. 8–9; 57 Cong.Rec. 549 (1918).

6. H.R.Rep. No. 2, 70th Cong. 1st Sess. 20; Sen.Rep. No. 960, 70th Cong. 1st Sess. 14; 69 Cong.Rec. 603; Sen.Rep. No. 665, 72d Cong. 1st Sess. 9–10.

7. H.R.Rep. No. 704, 73d Cong. 2d Sess. 17.

ing company and as operating company, their intercorporate transactions must be accorded recognition unless in some way tainted. Thus, parent-subsidiary debt is recognized for bankruptcy purposes unless it has its origin in mismanagement or overreaching, Taylor v. Standard Gas & Electric Co., 1939, 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669, or unless, as in Arnold v. Phillips, 5 Cir., 1941, 117 F.2d 497, a debt structure *so top-heavy with debt is built up* (though without mismanagement elements) as to require classifying it in whole or part as risk capital rather that debt. So too, if the affairs of parent and subsidiary are so commingled that all distinctions between them are obliterated, Weisser v. Mursam Shoe Corp., 2 Cir., 1942, 127 F.2d 344, 145 A.L.R. 467. Each of these factual situations has its tax counterpart.[8]

The Tax Court stated that " * * * on the facts here the petitioner, for all practical purposes, was a department of National Dairy, even though incorporated, and that National Dairy did not in a real sense become a creditor of petitioner." 21 T.C. 513, 599. We think that this conclusion that taxpayer, a vigorous and profitable operating company, was merely a department of National Dairy is an unwarranted extension of the dictum appearing in Prudence Securities Corporation v. Commissioner, 2 Cir., 1943, 135 F.2d 340, 341, to the effect that "A corpora-

tion, ordinarily, cannot in a real sense become a creditor of one of its own incorporated departments." We think that that statement must be read in close connection with the extreme and particular facts there involved;[9] it did not characterize all subsidiaries as incorporated departments which could not become debtors, for tax purposes, of their parents.

The Commissioner, however, argues that the present transaction is an abuse of the parent-subsidiary relation in that it is unfair to the subsidiary and financially unsound. He asserts that the interest rate was uncompetitive and that the alleged creditor interest of the parent would be subordinated to the claims of outside creditors in the event of taxpayer's insolvency or liquidation. Although it appears from the record that National Dairy was able to float its debentures on the market at 5¼%, in contrast to the 6% provided for in the debentures issued by taxpayer, we find nothing in the record which indicates that a 6% rate was unrepresentative or uncompetitive. The Commissioner's further assertion that the alleged creditor interest of National Dairy would be subordinated to the claims of outside creditors in the event of taxpayer's insolvency or liquidation, is not necessarily determinative, even if accepted as true. Subordination to general creditors is not necessarily indicative of a stock interest. Debt is still debt despite

8. E. g., Paymer v. Commissioner, 2 Cir., 1945, 150 F.2d 334; Advance Machinery Exchange v. Commissioner, 2 Cir., 1952, 196 F.2d 1006.

9. In the Prudence case the taxpayer was organized in the Prudence reorganization proceedings to liquidate slow mortgage and real estate assets held as security for the Prudence Company 5½% Collateral Trust Bonds. Taxpayer issued $10,000 of stock to the bankrupt estate, $6,966,000 of Series A bonds to the public holders of the 5½% Collateral Trust Bonds, and $847,750 of subordinated Series B bonds to the bankrupt estate for its holdings of the 5½% Collateral Trust Bonds. The taxpayer showed losses every year, some of which were converted into technical net income through retirement of Series A bonds at discount. The interest questioned was that on the Series B bonds held by the bankrupt estate. None of it had been paid, and "no reasonable person could assume that payment would ever be likely to occur." 135 F.2d 340, 341. In terms, the interest did not become payable unless a *default* occurred on the Series A bonds *and* those bonds were paid in full. " * * * [O]nly events approximating the bankruptcy of the debtor could bring about any reasonable possibility of payment of interest on the B bonds." 135 F.2d 340, 342. On these facts the taxpayer sought to deduct the interest on the Series B bonds.

subordination.[10] But here it is unnecessary to go so far, because circumstances such as fraud, abuse of power to dominate, and gross overcapitalization, which may justify subordination of a stockholder's claim,[11] are absent. Under the circumstances presented here, it is doubtful whether the claim of National Dairy would be subordinated to the claims of other creditors in the event of taxpayer's insolvency. See Schwartz v. Mills, 2 Cir., 1951, 192 F.2d 727, 729, 29 A.L.R. 2d 1161, where we interpreted and qualified statements appearing in In re V. Loewer's Gambrinus Brewery Co., 2 Cir., 1948, 167 F.2d 318, upon which the Commissioner relies.

We conclude that the transaction here involved cannot be disregarded for tax purposes merely because of the presence of a parent-subsidiary relation.

*2. No New Capital.*

The Commissioner argues that since the debentures were neither issued for borrowed money nor against accumulated earnings, they simply represented the originally-invested equity capital in a new dress. He asserts, in substance, that a closely held corporation and its controlling stockholders are powerless to change any part of initial equity capital into valid indebtedness by means of a dividend valid under state law. We think, however, that the very pattern of the tax statute recognizes that indebtedness may be created by a distribution or by a recapitalization exchange through the issuance of securities out of capital or earnings or both, though the tax treatment may vary with the method chosen.[12]

Further, the doctrine that a dividend creates a debt in favor of the stockholder has always been accorded full legal recognition in tax cases.[13] The debenture dividend in this case operated as a distribution and simultaneous borrowing back of funds. See Commissioner of Internal Revenue v. T. R. Miller Mill Co., 5 Cir., 1939, 102 F.2d 599. The legal effect of the debenture dividend should be no different than if cash had been distributed and immediately invested in debentures.

In many of the cases involving "hybrid securities" the courts have considered the nature of the original investment in ascertaining the relationship intended to be created. The principles applicable in those cases provide significant comparisons even though they cannot be entirely controlling in situations where, as here, the debenture is unambiguous and contains all the characteristics of a debt instrument. Those cases most similar on their facts to this case have held that a valid indebtedness may be created supported by funds originally constituting part of the debtor's equity capital.[14] In other cases

10. See Commissioner of Internal Revenue v. O. P. P. Holding Corp., 2 Cir., 1935, 76 F.2d 11; John Kelley Co., 1943, 1 T. C. 457, affirmed 1946, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278; Commissioner of Internal Revenue v. Page Oil Co., 2 Cir., 1942, 129 F.2d 748.

11. Pepper v. Litton, 1939, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (fraud); Taylor v. Standard Gas & Electric Co., 1939, 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669 (abuse of power to dominate); Isidor Dobkin, 1950, 15 T.C. 31, affirmed per curiam 2 Cir., 1951, 192 F.2d 392.

12. A debenture dividend is normally taxable as a "dividend" to the extent of available earnings; and non-taxable, but reducing the basis of the stock, to the extent exceeding available earnings. See § 115(a) of 1934 Act; §§ 301(c), 316, and 317(a) of 1954 Code. Recapitalization exchanges are dealt with in § 112(b) (3) and (g) of the 1934 Act and §§ 354(a) and 368(a) (1) (E) of the 1934 Code.

13. See Plant v. Walsh, D.C.D.Conn.1922, 280 F. 722; Bulger Block Coal Co. v. United States, 1931, 48 F.2d 675, 71 Ct. Cl. 636; Helvering v. McGlue's Estate, 4 Cir., 1941, 119 F.2d 167; Commissioner of Internal Revenue v. Goldwyn, 9 Cir., 1949, 175 F.2d 641; Crellin's Estate v. Commissioner, 9 Cir., 1953, 203 F.2d 812, certiorari denied 346 U.S. 873, 74 S.Ct. 123, 98 L.Ed. 381.

14. Lansing Community Hotel Corp., 1950, 14 T.C. 183, affirmed 6 Cir., 1951, 187 F. 2d 487; Toledo Blade Co., 1948, 11 T.C. 1079, affirmed 6 Cir., 1950, 180 F.2d

involving "hybrid securities" in which the courts placed reliance upon the fact that the claimed indebtedness brought no new money into the venture, the instruments were markedly dissimilar and the facts substantially different from those involved here.[15]

### 3. Alleged Thin Capitalization.

The Commissioner argues that since the transaction in question produced a disproportionate ratio of debt to capital it would not constitute genuine indebtedness as against third party creditors, and therefore it should not be treated as indebtedness against the Government for purposes of determining taxpayer's income tax liability. Undoubtedly, the debt-equity ratio resulting from a transaction is of great importance in determining whether an ambiguous instrument is a debt or an equity interest;[16] and perhaps this consideration is of such overriding importance that even an indebtedness valid under state law should be disregarded for federal tax purposes. However, it is unnecessary for us to decide that question here, for it is apparent from the record that no disproportionate ratio of debt to capital resulted from the issuance of the debentures.[17] We think it obvious that in the determination of debt-equity ratios, real values rather than artificial par and book values should be applied. See B. M. C. Mfg. Corp., 1952, P. H. T. C. Memo. Dec. ¶52,106; Cleveland Adolph Mayer Realty Corp., 1946, 6 T.C. 730, reversed on other grounds, 6 Cir., 1947, 160 F.2d 1012.

### 4. Business Purpose.

The Commissioner contends that the debenture issue should be disregarded for tax purposes because it served no business purpose other than the minimization of taxes. Although the taxpayer attempts to find a business purpose in the replacement of an artificial financial structure with a more realistic one, it concedes that tax considerations were the primary motivation of the debenture issue. Assuming, then, that the purpose of the transaction was to minimize taxes, should the transaction be disregarded because of its tax motivation?

The Commissioner argues that transactions, though formally perfect and in compliance with a provision of the tax statute, must be disregarded if they have no purpose germane to the conduct of the business other than tax minimization. He relies on Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Minnesota Tea Co. v. Helvering, 1938, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Griffiths v. Helvering, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed.

357, certiorari denied 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596; John Kelley Co., 1943, 1 T.C. 457, 462, affirmed 1946, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278, reversing 7 Cir., 1944, 146 F.2d 466; Elliott-Lewis Co., Inc., 1945, 4 T.C.M. 136, affirmed 3 Cir., 1946, 154 F.2d 292; Cleveland Adolph Mayer Realty Corp., 1946, 6 T.C. 730, reversed on other grounds 6 Cir., 1947, 160 F.2d 1012; Clyde Bacon, Inc., 1945, 4 T.C. 1107.

15. See, e. g., Brown-Rogers-Dixson Co. v. Commissioner, 4 Cir., 1941, 122 F.2d 347; Mullin Building Corp., 1947, 9 T. C. 350, affirmed per curiam 3 Cir., 1948, 167 F.2d 1001; Staked Plains Trust v. Commissioner, 5 Cir., 1944, 143 F.2d 421; Talbot Mills, 1944, 3 T.C. 95, affirmed 1 Cir., 1944, 146 F.2d 809, affirmed 1946, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278.

16. See 1432 Broadway Corp., 1945, 4 T.C. 1158, affirmed per curiam 2 Cir., 1947, 160 F.2d 885; Mullin Building Corp., 1947, 9 T.C. 350, affirmed per curiam 3 Cir., 1948, 167 F.2d 1001; Swoby Corp., 1947, 9 T.C. 887. Consult "Thin Capitalization and Tax Avoidance," 55 Col.L.Rev. 1054 (1955).

17. The actual cost and tax basis of taxpayer's assets was about $72,000,000. The paid-in capital at acquisition after assumed liabilities of less than $3,000,000 was therefore about $69,000,000. The debenture issue reduced taxpayer's paid-in capital to about $39,000,000. Since its real capitalization (as distinct from its paper capitalization) thereafter was composed of $30,000,000 of debt and $39,000,000 of equity capital, the ratio of debt to equity resulting from the transaction was about 10 to 13.

319; Higgins v. Smith, 1941, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Bazley v. Commissioner, 1947, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782; Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659. We do not think that these cases hold that tax minimization is an improper objective of corporate management; they hold that transactions, even though real, may be disregarded if they are a sham or masquerade or if they take place between taxable entities which have no real existence. The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact. As Judge Learned Hand said in Loewi v. Ryan, 2 Cir., 1956, 229 F.2d 627, 629, " * * * the Act is to be interpreted against its own background, and in deciding how far it adopted all legal transactions that the state law may have covered, it was proper to exclude those that had no other result than to evade taxation. The purpose of the Act was to exempt from tax only such legal transactions as arose out of an enterprise or venture that had some other authentic object of its own, and were neither alien and hostile to the raising of revenue, nor designed to effect no change in legal interests except to defeat a tax." [18]

■ Both National Dairy and taxpayer are substantial enterprises engaged in separate businesses involving millions of dollars each year, exclusive of intercorporate transactions. Taxpayer is one of the nation's largest food companies; its name is a household word. Taxpayer cannot be characterized as an unreal corporate entity. Likewise with the transaction involved here. The parties, each having a separate and real corporate personality, engaged in certain objective acts with the intent of creating legal rights and duties. We think that the occurrence of these acts affected their legal relations. Since the acts were real and the taxable entities cannot be characterized as sham entities, the transaction should not be disregarded merely because the transaction was entered into in response to a change in the governing tax law.[19]

We conclude that the order of the Tax Court should be reversed.

CLARK, Chief Judge (dissenting).

The very care and concern so manifest in Judge Waterman's able opinion to search out arguments for a result somewhat startling in its possibilities for lessened tax liability of interconnected

18. See, also, Moline Properties, Inc., v. Commissioner, 1943, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499; National Carbide Corp. v. Commissioner, 1949, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779, affirming 2 Cir., 1948, 167 F.2d 304; National Investors Corp. v. Hoey, 2 Cir., 1944, 144 F.2d 466, 467; O'Neill v. Commissioner, 2 Cir., 1948, 170 F.2d 596, 598; Chisholm v. Commissioner, 2 Cir., 1935, 79 F.2d 14, 15, 101 A.L.R. 200, certiorari denied 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456.

19. There is no doctrine that taxpayers cannot adjust their affairs in response to a change in the tax law so as to reduce taxes. Indeed, the structure of the tax law deliberately recognizes tax-conscious motivations and seeks both to encourage them (e. g., rapid amortization of defense facilities, §§ 124, 124A, and charitable deduction for gifts of appreciated property) and to discourage them (e. g., surtax on unreasonable accumulation of surpluses, § 102, and provisions in §§ 24 and 45 relating to transactions between related taxpayers). The Revenue Bill of 1928, which initially contained a provision abolishing consolidated returns, recognized the need of corporate taxpayers to adjust to the proposed new system by postponing the effectiveness of the change until 1929. When Mr. Green during the House debates was asked why the change was to be made effective in 1929 and not in 1928, he answered: "So [corporations] can get ready for it and adjust their accounts accordingly. * * A matter of bookkeeping and getting themselves adjusted to it." 69 Cong.Rec. 603 (1928).

corporations itself carries warning of the difficulties, not to say technicalities, of the conclusion reached and the lifting-by-bootstraps reasoning necessary to reach it. Of course I have been at this business long enough now not to be startled by new vagaries of statutory interpretation in tax law; moreover, we are but a station on the way to definitive exposition by the Supreme Court, and then perhaps to new legislation at the behest of the Treasury to plug the gaps which judges, aided by astute tax counsel, have uncovered. So this case, if it is at all unique in the normal tax process I have indicated, is so only perhaps in being somewhat more striking in that Congress in attempting to stop a comparatively small leak in revenues through the operation of consolidated returns from intertwined corporations now finds itself with the intent by repeal of this provision to open up a large leak, indeed, operable merely by denominating an intercorporate allocation of surplus a debt, not a dividend. Since the matter of repayment is so obviously not a matter of present or perhaps even of potential concern, I cannot think such view of legislative intent at all realistic. And the basic rationale that the indebtedness must be genuine because only a valid indebtedness will give rise to, i. e., make legal, the hoped-for tax benefit to me seems a naive ground for upholding a tax deduction.

Hence in my view the approach adopted by the Tax Court in its en banc decision, 21 T.C. 513, while perhaps not so neat and tidy as the one now to be substituted, seems more appropriate to the circumstances and more in consonance with the probable intent of Congress. It is in effect to test the genuineness of the intercorporate indebtedness by objective standards, rather than by the subjective purpose of the parties to relieve themselves of a tax burden, even if tax minimization be accepted as a laudable ambition. Once we adopt this method of approach all of the factors rejected in the opinion, as well as others discussed below, are seen to be persuasive considerations which added together amply justify the finding made of lack of genuine debtor-creditor relationship between these close corporations. Indeed, I suggest there is hardly anything to offset these objective indicia of lack of indebtedness in the ordinary sense, i. e., a debt whose nonpayment leads to foreclosure or attachment and execution, except the obvious subjective desire to secure the maximum tax relief. This, as is ruled in John Kelley Co. v. C. I. R., (Talbot Mills v. C. I. R.), 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278, is an excellent occasion for an appellate court to accept the trier's careful weighing of the facts. The obvious invitation extended by our failure to do so here seems to me to open a Pandora's box for the future. Surely the process whereby the taxpayer has supplemented its product—cheese—by a marvelous by-product—the pure gold of tax avoidance—will stimulate imitators.