100 So.2d 876

**Rufus W. FONTENOT, Collector of Revenue, State of Louisiana,**

**v.**

**JEFFERSON LAKE SULPHUR COMPANY.**

No. 43681.

Feb. 10, 1958.

Rehearing Denied March 17, 1958.

Chapman L. Sanford, Levi A. Himes, Robert L. Roland, Baton Rouge, for appellant.

Deutsch, Kerrigan & Stiles, New Orleans, Eberhard P. Deutsch, Rene H. Himel, Jr., H. Paul Simon, New Orleans, of counsel for defendant-appellee.

HAWTHORNE, Justice.

This is a summary proceeding instituted by the Collector of Revenue of the State of Louisiana under the provisions of R.S. 47:- 1574, in which he seeks judgment against Jefferson Lake Sulphur Company in the sum of $6271.38 for Louisiana state income taxes for the years 1947, 1948, and 1949, plus statutory interest and attorney's fees.[1]

The taxpayer answered, praying that the rule be dismissed and that there be judgment recognizing its right to a refund of corporation income tax of $1793.83 for 1947 and $4329.49 for 1948 plus interest and fixing its liability for corporation income tax for the taxable year 1949 at $3448.07 with interest.

After trial on the merits there was judgment as prayed for by the taxpayer, and the Collector of Revenue has appealed.

At the beginning of the trial the parties stipulated, among other things, that the taxpayer was entitled to the refund of $4329.49 for the year 1948 plus interest at 2 per cent per annum from May 15, 1949, until paid, as prayed for by the taxpayer in its answer, and accordingly the

1. The taxpayer was Jefferson Lake Sulphur Company, Inc., a Louisiana corporation. On December 31, 1949, the taxpayer merged with Jefferson Lake Sulphur Company, a New Jersey corporation, and pursuant to this merger defendant herein became the transferee of the taxpayer's assets, assuming all its debts and liabilities.

taxpayer's income tax return for the taxable year 1948 is not at issue in these proceedings. The basis of the present controversy, then, is the taxpayer's returns for the taxable years 1947 and 1949.

An examination made by the collector of the taxpayer's income tax returns for the years in controversy disclosed that the taxpayer had claimed as a deduction in the year 1947 an item of $36,030 for worthless stock of a subsidiary corporation, Vacuum Concentrator, Inc., and that it had claimed as a deduction in the year 1949 an item of $200,180.39, of which $10,000 was claimed as worthless stock of a subsidiary corporation, Gas Chemicals, Inc., and $190,180.39 was claimed as a loss in connection with the operation and dissolution of that subsidiary.

The stipulation made by all parties, insofar as pertinent here, reads as follows:

"We stipulate that if the defendant is entitled to the $36,030 deduction claim for the 1947 return on the account of Vacuum Concentrator, Inc., he is entitled to a refund of $1,793.83 plus interest at the rate of 2% per annum from May 5, 1948 until paid. Second, if defendant is not entitled to the $36,030 deduction claim, he is entitled to a refund of $854.31 plus interest at the rate of 2% per annum from May 15, 1948, until paid. We further stipulate the defendant is entitled to a refund of $4,329.49 for the year 1948 plus interest at the rate of 2% per annum from May 15, 1949 until paid. We

further stipulate that if the defendant is entitled to the $200,180.39 deduction claim out of the Gas Chemicals, Inc. transaction he owes additional tax of $3,448.07 plus interest at the rate of 6% per annum from May 15, 1950 for four years from that date and then additional interest at the rate of 3% per annum thereafter until paid. We further stipulate that if the defendant is not entitled to the $200,180.39 deduction claim he owes additional tax of $11,455.18 for the year 1949 plus interest at the rate of 6% per annum for four years from May 15, 1950 and at the rate of 3% per annum thereafter. * * *"

After trial on the merits the district court, as we have stated above, concluded that the taxpayer was entitled to the deductions claimed and rendered judgment fixing the amount of tax due in accordance with the above stipulation.

Mr. Eugene H. Walet, Jr., president of the Jefferson Lake Sulphur Company, testified at the trial of this case at great length. From Walet's testimony and numerous exhibits it appears that on May 4, 1942, Jefferson, a corporation primarily engaged in the production of crude sulphur, and Universal Classifiers, Inc., an Arizona corporation, formed a jointly owned subsidiary, Vacuum Concentrator, Inc., a Nevada corporation, to develop a patented process for separating metals from their ores, which process was then owned by

Classifiers. Jefferson immediately bought 51 per cent of Classifiers' license rights under the patents involved and transferred these rights to Vacuum in return for 16,830 shares of the common stock of Vacuum, with reservation to Jefferson of certain royalty interests. Jefferson also bought 16,830 shares of Vacuum's common stock for $16,830. In return for 16,170 shares of common stock, Classifiers assign to Vacuum its remaining 49 per cent interest in the license rights of the patents it owned, reserving royalty interests, and also bought 16,170 shares of Vacuum common capital stock for $16,170. According to Jefferson's records, in 1943 it made cash advances to Vacuum totalling $39,000. As evidence of these advances Vacuum executed and gave to the taxpayer a series of promissory notes bearing 6 per cent per annum interest, which interest was paid regularly. These notes were secured by the pledge of a note for $50,000, which in turn was secured by a chattel mortgage on equipment, machinery, materials, supplies, etc., belonging to Vacuum. These notes were further secured by a pledge of certain patent and license rights owned by Vacuum. The property thus pledged was to secure not only the payment of these notes but also the payment of any other obligation or liability then existing or thereafter arising up to $50,000. From January 7, 1944, through May 1, 1944, Jefferson paid an additional $20,000 to Vacuum for additional common stock and pat-

ent royalty interests. In May of 1944 Classifiers bought additional patent royalty interests from Jefferson for $15,000, of which Jefferson paid $2272.50 to Vacuum on behalf of Classifiers, and Vacuum issued to Classifiers 18,719 shares of its common stock. On December 22, 1944, Classifiers donated all of its Vacuum stock to Vacuum. From 1944 until early in 1946 Jefferson made additional cash advances to Vacuum and paid some of its expenses. Early in 1945 Vacuum sold its physical assets to Products Separating Corporation of New York and paid to Jefferson $46,590, the proceeds of the sale, retaining as its assets only patent license rights and $269.62. In 1947 Vacuum assigned all of its patent rights to Sutton, Steele & Steele, leaders in the field of separating equipment, reserving a 10 per cent royalty, and went into voluntary liquidation. Its only assets were $269.62 in cash and the royalty interests reserved in the assignment to Sutton, Steele & Steele. At this time the taxpayer was Vacuum's sole creditor and owned all of its outstanding stock. Vacuum owed the taxpayer $29,185.95 for cash advances and payments of expenses, and in liquidation transferred all of its assets to the taxpayer in satisfaction of this liability. In computing its taxable income for 1947 the taxpayer deducted as worthless its $36,030 investment in Vacuum's capital stock, but this deduction was disallowed.

It also appears from Mr. Walet's testimony and from exhibits filed that during World War II carbon black was very scarce, and that in 1942 or 1943 Jefferson was approached by Minerals Consolidated Ltd., a group of people who claimed that they had developed a new way of producing a furnace type of carbon black from natural gas. On April 1, 1943, Jefferson's board of directors adopted a resolution giving the officers of the company authority to proceed with Minerals Consolidated in the project for the production of carbon black. This resolution showed that, according to the engineers' estimate, $150,000 would be needed for the construction of an initial plant, and authorized Jefferson to spend not in excess of $175,000 for this project. This resolution provided, among other things, that the taxpayer was to provide the funds necessary for the construction of the initial plant; that the taxpayer was to be reimbursed for such money as it might advance for the construction and operating fund of the initial project out of 60 per cent of the net profits of the project, and that the remaining 40 per cent of net profits was to be divided 50-50 between the taxpayer and Minerals Consolidated. Various negotiations took place between Jefferson and Mr. L. A. Glover, the representative of Minerals Consolidated, and of significance is the fact that they agreed to form a Nevada corporation to construct the proposed carbon plant, and that the money to be advanced by the taxpayer for construction of this plant was to be secured by the entire issue of first preferred stock of the proposed corporation. Although the project to produce carbon black with Minerals began as a commercial manufacturing venture, the War Production Board refused to issue a permit and allocate the materials for a commercial plant in such an untried field, and told the Jefferson people that further research should be done before entering on a commercial venture. Meanwhile, in May of 1943 Jefferson and Minerals formed Gas Chemicals, Inc., a Nevada corporation, to manufacture carbon black, formalin, methanol, and other chemicals. The corporation charter provided that the amount of the total authorized capital stock of the corporation was to be $300,000 divided into 3450 shares. Of this, 1500 shares were to be first preferred stock with a par value of $100 a share; 1450 shares were to be second preferred stock, also with a par value of $100 a share; and 500 shares were to be common stock with a par value of $10 a share. No stock was issued at this time. However, Glover and others from Minerals who were interested in Gas Chemicals had been financed by English money, and as the war went on, their funds were cut off, with the result that Minerals gradually dropped out of the picture without having contributed anything whatever to this venture, and Jefferson was left to carry on the project alone. By this time, 1945, a total

of $82,000 had been advanced by Jefferson to Gas Chemicals, Inc., or to Doctor Hall, the scientist working at the pilot plant, or to Mr. Glover or Minerals Consolidated —all being cash advances for the account of this venture, which were recorded in a suspense account. In April, 1945, Jefferson caused to be issued to itself 500 shares of common stock at par value ($10 per share) and 50 shares of preferred stock at par value (100 per share) of Gas Chemicals, Inc., having a total par value of $10,000. This $10,000 was deducted from the $82,000 of the suspense account, and the balance of $72,000 was transferred from the suspense account and carried as accounts receivable on Jefferson's books. The stock thus issued constituted all of the outstanding stock of Gas Chemicals, and by this transaction the taxpayer became the sole owner of Gas Chemicals, Inc. In other words, Gas Chemicals was a totally owned subsidiary of Jefferson. Two pilot plants were built, and finally a small commercial plant was erected at Clemens Dome, Brazoria County, Texas. From 1946 to 1949 Gas Chemicals, Inc., was largely inactive, but the plant was maintained in good condition during that time. The prospectus issued by Jefferson Lake Sulphur Company in September of 1945, under the hearing "Subsidiaries of Company", stated that the subsidiary corporation Gas Chemicals, Inc., was inactive, and that unless the company desired to use that corporation for some active purpose,

it was Jefferson's intention to liquidate it. By the end of 1948 Jefferson had advanced to Gas Chemicals $193,987.51. In 1949 Jefferson decided to abandon its research project, and liquidated Gas Chemicals in December of that year. Upon the liquidation of this subsidiary Jefferson received assets valued at $3807.12, which was applied against the $193,987.51 advanced by Jefferson to Gas Chemicals, leaving a balance of $190,180.39. In its state income tax return for 1949 Jefferson deducted this $190,180.39 as a bad debt and also deducted the $10,000 of Gas Chemicals capital stock as worthless. These deductions were disallowed by the collector.

As shown in the statement of facts, both subsidiary corporations failed and were liquidated, and in these liquidations the taxpayer received only a small portion of the total amounts advanced to these subsidiaries. The issue for decision on this appeal is an issue of fact—that is, whether some of the funds which were advanced by the taxpayer to these two subsidiary corporations, Vacuum Concentrator, Inc., and Gas Chemicals, Inc., were loans, or whether all of the advances were capital investments.

The taxpayer contends that some of these advances were loans, and that it therefore rightly deducted as bad debts the excess of these advances over the amounts received on liquidation of these subsidiaries, and rightly deducted as worthless the

amounts which it had invested in stocks of these subsidiaries.

It is the collector's position that the taxpayer is not entitled to the deductions claimed because all of the advances were capital contributions; in other words, that the amounts claimed as deductions were capital losses deductible only from capital gains, of which the taxpayer had none in the years at issue.

This is the first time this court has had to decide whether an advance of money to a subsidiary corporation by a corporation owning a large amount of stock in the subsidiary, under a particular set of circumstances, amounts to a contribution to the subsidiary corporation's capital or whether it is in fact a loan to the subsidiary corporation. The federal courts, however, have had occasion many times to consider whether advances to a corporation by the principal stockholder or stockholders are contributions to capital or loans. These courts hold that the burden is on the taxpayer to prove that the advance was a loan; that the intent of the parties is the controlling feature; that this intent can be deduced from the circumstances under which the advance occurred —that is, bookkeeping, parties' expression of the character of the transaction, the expectation of repayment, the relation of the advance to the stockholding, and the adequacy of the corporation's capital pre-

viously invested. White v. United States, 305 U.S. 281, 59 S.Ct. 179, 83 L.Ed. 172; Matthiessen v. Commissioner of Internal Revenue, 2 Cir., 1952, 194 F.2d 659; Rowan v. United States, 5 Cir., 1955, 219 F.2d 51; Kraft Foods Co. v. Commissioner of Internal Revenue, 2 Cir., 1956, 232 F.2d 118.

Our own Louisiana statute, R.S. 47:1574 (4), provides that whenever the pleadings filed by the tax collector shall be accompanied by an affidavit of the collector or other person designated in the statute that the facts alleged therein are true to the best of affiant's knowledge and belief, all of the facts alleged in the pleadings shall be accepted as prima facie true and as constituting a prima facie case, and *the burden of proof to establish anything to the contrary shall rest wholly on the defendant.*

The question for decision under the law, then, is whether it was the intent of the taxpayer here that some of the advances made to these subsidiaries were to be bona fide loans with contemplation of repayment; and the burden is on the taxpayer to prove this fact.

■ We are in full accord with the trial judge's finding that the deduction of $36,030 for worthless stock shown in the taxpayer's 1947 income tax return was proper; and, as we view the matter, the taxpayer has sustained the burden of proof by showing that from the inception

the advances made by it to its subsidiary Vacuum Concentrator, Inc., were bona fide loans with contemplation of repayment —all of which is fully shown, according to our view, by the facts set out above with reference to this particular subsidiary. In considering this deduction the trial judge said:

"The pertinent facts are not in dispute * * *.

"Those facts make it clear that Vacuum was a substantial corporation from the outset, with paid-in capital of about $65,000, consisting of $33,000.00 cash and patent rights for 51% of which taxpayer had paid $16,170.00.

"Moreover, after making $39,000 of secured loans to Vacuum, taxpayer and its associate in the undertaking purchased more stock in Vacuum, for which, together with an adjustment of royalty interest, $20,000 was paid.

"Thereafter, taxpayer advanced further sums to Vacuum, until the total advances reached $75,775.95.

"The highest debt to capital ratio claimed by the Collector was only 2.04 to 1.

"The only point in Collector's favor is that the latter advances to Vacuum, some of which occurred after taxpayer became sole owner of Vacuum, were represented only by accounting entries, rather than by notes. But this point alone is not sufficient for a determination that all advances to Vacuum were intended by taxpayer as capital contributions; it is certainly not an unusual circumstance in dealings of this kind.

"The federal cases cited by the Collector are readily distinguishable from the present case by the obvious devices used therein, such as initiating corporate life with 'loans' secured by stock; forming corporations for developing real estate with the purely nominal 'capital' of $1,000; of issuing corporate 'debentures' solely in exchange for stock.

"The testimony and exhibits of taxpayer satisfy the Court that the amounts charged off as worthless debts were in fact debts, and did not represent taxpayer's contribution to Vacuum's capital."

The judgment of the district court decreeing that the defendant is entitled to a refund of corporation income taxes for the year 1947 in the sum of $1793.83 with interest at the rate of 2 per cent per annum from May 5, 1948, until paid is therefore correct and will be affirmed.

Let us now consider the 1949 income tax return of the taxpayer on which it claimed a deduction of $200,180.39 in connection with the operation and dissolution of its subsidiary Gas Chemicals Inc., —$10,000 claimed as worthless stock of that subsidiary corporation, and $190,180.39 as a bad debt. With respect to that sub-

sidiary the trial judge in his written reasons for judgment says in part:

"From the beginning, taxpayer knew substantial capital was necessary for the contemplated project. A resolution of its Board (Ex. R 3) shows engineers' estimate of $150,000 for the construction of a plant. The resolution authorized $175,000 for the project.

"A letter of agreement from taxpayer to Mr. Glover, representing taxpayer's associates in the enterprise, dated May 17, 1943 (Ex. R 5) provided:

"(e) The amount of money to construct the plant will be advanced by us * * * and secured by entire issue of First Preferred *stock* * * *

"The corporate charter of Gas Chemicals provided for $150,000 First Preferred Stock (Ex. R 6), on which no interest was to be paid for the first ten years.

"The Board's resolution referred to above shows that the advances were to be repaid out of 60% of the net profits, which is also to say that the advances were subordinated to stockholders' rights insofar as 40% of the net profits were concerned.

"When the corporate stock was issued, taxpayer's co-adventurer had disappeared from the picture, and taxpayer caused to be issued to itself the entire common stock (500 shares at $10 each) and 50 shares of $100-par First Preferred Stock (Ex. R 11). Taxpayer thus limited itself, by this accounting method, to $10,000 capital investment, although at that time it had already advanced $82,000 to Chemicals.

"The total advances and expenditures for Chemicals reached $193,987.51, making a debt to capital ratio of about 19.4 to 1. But even the initial ratio when the corporate life began was 7.2 to 1.

"No notes or other evidence of indebtedness were ever given.

"For the several reasons cited above, there can be no doubt that taxpayer from the very beginning intended to place his advances in the capital of Chemicals.

"But, while the intention is clear, it is clear only insofar as (1) the Board knew that about $150,000 was required to build a plant and authorized $175,000 for the project; and (2) the preferred stock 'security' amounted to $150,000. From the evidence from which we deduce taxpayer's intention to supply capital, we deduce its explicit intention to supply, at best, $175,000 of capital. *For the advances in excess of that amount there is no evidence to justify holding that those advances were intended as capital investments."* (Italics ours.)

The trial judge allowed the deduction claimed on this basis: He found that, at best, $175,000 out of the total cash ad-

vances and expenditures was a capital investment or capital contributions. He next deducted the amount found to be capital contributions from the total cash advances and expenditures and concluded that the difference of $28,987.51 was a loan. He found that the sum of $3807.12 received in the liquidation was properly applied against this difference, that the balance became a bad or worthless debt, and that therefore the total capital investment was then destitute of worth and could be properly charged off upon the liquidation of the subsidiary corporation.

We are in full accord with the trial judge that it was the intention of the taxpayer from the beginning to supply $175,000 of capital to the subsidiary, and that no part of this amount can be considered as a loan. However, as to the advances and expenditures in excess of this amount, the trial judge concluded that this excess constituted a loan for the reason that "there is no evidence to justify holding that those advances were intended as capital investments".

In our view it will not do to hold that this excess constituted a loan solely because of the want of evidence to show that it was intended as a capital investment. Under the law the taxpayer had the burden of proving that this was a loan, and the collector was not required to offer evidence to show that these advances were intended as capital investments.

Nowhere in the record can we point to any fact or circumstance establishing to our satisfaction that the taxpayer's later advances to Gas Chemicals were made as bona fide loans with contemplation of repayment. We think the facts show that repayment, if expected at all, could be anticipated only out of highly speculative and uncertain future earnings of the subsidiary, as the only source of operating moneys was advances made by the taxpayer. Moreover, the intent to obtain reimbursement from future profits is specifically stipulated in the original agreement between the incorporators—all as set forth in our statement of facts given above.

The judgment of the district court allowing the $200,180.39 deduction claimed by the taxpayer in its 1949 income tax return is therefore erroneous.

For the reasons assigned the judgment appealed from is amended by increasing the judgment in favor of the Collector of Revenue for the State of Louisiana, plaintiff, and against Jefferson Lake Sulphur Company, defendant, from $3448.07 to $11,455.18 with interest at the rate of 6 per cent per annum for four years from May 15, 1950, and at the rate of 3 per cent per annum thereafter, which amount represents additional income taxes for the year 1949. In all other respects the judgment appealed from is affirmed.