### ARNOLD v. PHILLIPS.

### In re SOUTHERN BREWING CO.
#### No. 9660.

Circuit Court of Appeals, Fifth Circuit.

Feb. 4, 1941.

Rehearing Denied March 8, 1941.

Leon Jaworski, of Houston, Tex., for appellant.

J. C. Hutcheson, III., of Houston, Tex., for appellee.

Before FOSTER, SIBLEY, and Mc-CORD, Circuit Judges.

SIBLEY, Circuit Judge.

In a bankruptcy case the district court on the trustee's petition set aside a duly recorded deed of trust against the bankrupt corporation's entire plant, made over four years before bankruptcy to its then President and dominating and practically sole stockholder to secure advances of money to the corporation. A foreclosure of it by sale under power six months before bankruptcy was also cancelled, the deed being unrecorded at bankruptcy, and the bankrupt adjudged to be the owner of the property free of this incumbrance. The appeal is from this judgment.

The legal theory of the decision stated by the district judge is that the original capitalization of $50,000 in 1933 was then known to be inadequate; that on September 5, 1934, when the deed of trust was made to secure past advances of $75,500 and interest, and contemplated future advances, the stockholder was seeking to protect himself not from the corporation, but against its then and future creditors, which was inequitable under the decisions in Taylor v. Standard Gas & Electric Company, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, and Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, and that the advances are to be treated not as debts but stock subscriptions. The trustee puts

forward an additional theory that the corporation was but the agency or instrumentality of the stockholder and that its corporate entity is to be wholly disregarded, and the view taken that the stockholder cannot have a debt against himself, nor a deed of trust against his own property.

The appealing stockholder, A. M. Arnold, contends that the matter is controlled by Texas law, and under that law the debt and security, though to an officer and sole stockholder, are valid; but if not, because the deed of trust was recorded before any of the creditors now represented by the trustee gave credit to the corporation, none of them can question it, and the trustee cannot. Also, that the failure to record the foreclosure deed before the bankruptcy did not avoid it, because Arnold, who bought in the property, at once leased it to the bankrupt, whose possession as Arnold's tenant was notice of Arnold's title and equivalent to record.

The important facts are in brief these: Arnold was and is in the building and contracting business. With the cessation of national prohibition in 1933 he thought money could be made in the beer brewing business. He interested a brewer, Souza, and in July, 1933, obtained a Texas charter for Southern Brewing Company, the bankrupt, by which he, his son-in-law Otto, and Souza were named directors for the first year, and the capital stock was fixed at $50,000, all paid in cash by Arnold, to whom 498 shares were issued, and one share each to the other directors. While the brewery was building, it was decided to enlarge it to include a bottling plant. By the end of the year Arnold had advanced, on demand notes, about $70,000 in addition to the $50,000 capital, and the plant had cost approximately $115,000. Additional advances were made to begin operations, Arnold guaranteeing some of the accounts for supplies. At the end of the fiscal year, June 30, 1934, a demand note for the $75,500 of advances and interest at 8% was made. On September 5, 1934, a substitute note was given for $79,-729, due September 5, 1937, with interest at 6%, and secured by a deed of trust on the entire plant, in which Arnold's daughter, Mrs. Otto, was trustee. The deed stated that it was to secure also future contemplated indebtedness, and was duly recorded. For two years thereafter the business prospered, a salary to Arnold ranging from $15,000 to $25,000 per year

was set up on the books, but by no formal action of the directors, and was paid, totalling $45,000. Interest was also paid on Arnold's note to an amount of $19,000, and a credit on principal of $27,400, so that the note stood at $52,392 on October 31, 1936. In the corporation's financial statement of that date, after all these payments to Arnold a surplus was shown of about $97,000. The business then began to lose money. The salary credited to Arnold during the next year he had charged off the books. He collected no interest, and in February, 1937, he began making further advances which by May, 1938, amounted to about $47,000. On May 4, 1938, he gave his son-in-law Otto all his stock, and Otto took over the management, though Arnold still helped him. Otto also began making some advances and got Arnold to furnish yet more, so that in the fall of 1938 Arnold's advances stood at $99,379, including the $52,392 balance of the initial advances. He decided in October, 1938, to foreclose on the plant; the daughter as trustee sold it at public outcry under the power in the deed. Arnold made the only bid, the amount of his debt, and obtained a deed but did not record it. The same day he leased the plant to the corporation, which continued to operate there without any apparent difference. Bankruptcy occurred six months later. The unsecured indebtedness is about $66,000. Assets besides the plant have proven of little value, and are not sufficient to pay these creditors. Arnold has since his purchase of the plant refused $200,000 for it. Its cost according to the books was $238,-000, and its book value as depreciated is $147,000. There is no pleading, no evidence and no finding of any intentional fraud, or of mismanagement other than is implied in what has been stated. The apparent loss in dealing through Monte Carlo Distributing Company is adverted to below.

The parties differ radically as to what system of law controls. We are of opinion that in a bankruptcy case the ownership of property depends ordinarily on the State law, and so does the existence of a debt and the validity of the security for it. The enquiry begins in State law, but does not end there. Whether when bankruptcy supervenes a title acquired by one creditor is good against other creditors, and what are the relative rights and standing of creditors as against each other, and what the propriety of recognizing

and enforcing secured debts under varying circumstances, are questions so related to the bankruptcy power as to be regulable by Congress; they are of the essence of bankruptcy law. There necessarily arises also a body of judicial interpretation having the effect of law, which overrides the interpretations of the State courts on similar questions. The "equity" administered in the bankruptcy courts may not be exactly that of the State courts. We think in this case we ought to give the more earnest heed to the federal conceptions of the equities of creditor and stockholder relationships where corporations are involved.

The district court properly looked behind the title Arnold acquired at the sale held by his own daughter six months before bankruptcy. Neither the deed he got nor the lease he made was recorded; the occupancy appeared afterwards to be just what it had always been. Only himself, his daughter and his son-in-law participated. The son-in-law, owner by gift from Arnold of the stock of the corporation, and with a well-justified expectation that things would go on as before if Arnold bought the property for his debt, had no incentive to see that it brought more. The family interest was to acquire the property for what the family had invested, eliminating other creditors' claims. The property sold was evidently worth much more than the sum bid. The relationship of the participants and the inequity of the result might well condemn the sale if there was no question about Arnold's debt. A fortiori it should not cut off enquiry into the validity of that debt, regardless of whether or not the lease and possession under it was, under the State law, the equivalent of recording the deed before the trustee's lien attached.

The appellant contends that, under a series of State decisions, when property is deeded away in fee simple, or only as security for a debt, and the conveyance is duly recorded, subsequent creditors are charged with notice of the recorded conveyance, do not credit that property, and cannot attack the conveyance, even though the consideration be fictitious or fraudulent. That such is the law of Texas the trustee contests. We will not enquire into the alleged peculiarity of the Texas law, for we hold that in bankruptcy the reality and honesty of every secured debt may be investigated. We also think that as

to the advances subsequent to the making of the deed of trust it had no operative effect until the advances were in fact made. Some of these were within a few months before the bankruptcy. There is no evidence that the present unsecured creditors all gave credit since then, but only that they gave credit within two years before bankruptcy. It does not appear that they are subsequent creditors.

The two series of advances differ materially as respects their nature and purpose. Those made before the enterprise was launched were, as the district court found, really capital. Although the charter provided for no more capital than $50,000, what it took to build the plant and equip it was a permanent investment, in its nature capital. There was no security asked or given. Arnold saw that he could not proceed with his enterprise unless he enlarged the capital. There can be little doubt that what he contributed to the plant was actually intended to be capital, notwithstanding the charter was not amended and demand notes were taken. The district court was justified in concluding as a matter of fact that the advances during the first year were capital, a sort of interest-bearing redeemable stock; and that as a matter of law these contributions could not, as against corporate creditors, either precedent or subsequent, be turned into secured debts by afterwards taking and recording a trust deed to secure them. There was no debt to be secured.

After two years of prosperity, with the original capital thus enlarged demonstrated to be sufficient, with a book surplus of nearly $100,000 after payment of large salaries and dividends in the form of interest, there arose a situation very different from that in the beginning. Adversity then occurring raised a problem not different from that which commonly faces a corporation having losses. It may borrow to meet its needs. Had this corporation borrowed of a bank upon the security of the plant, the debt would no doubt be valid. What would render it invalid when Arnold furnished the money? As to each of these later advances, it is testified without contradiction that it was made after consultation with Otto, the Secretary and Treasurer, and on the security of the deed of trust. The money went to relieve the needs of the business exactly as it would have done if a bank had advanced it. No other creditor was prejudiced or misled.

There are no circumstances which discredit the testimony. They were truly loans and not new capital. With additional clearness all this is true as to the advances made after May 4, 1938, when Arnold was no longer a stockholder or officer at all.

■ We do not think a case is presented where the corporate entity ought to be disregarded as being a sham, a mere obstacle to justice, or instrument of fraud. It is not denied that a corporation, owned by one man save for qualifying shares, is lawful in Texas. That it was created to shield the owner from liability beyond the capital set up by the charter does not show an unlawful or fraudulent intent, for that is a main purpose of every incorporation. It becomes an evidence of fraud only when the capital is unsubstantial and the risk of loss great, or the contributions to capital are greatly overvalued, and the like. It would be hard to say in this case that $50,000 was not a substantial capital, and impossible so to say after holding that the real capital was $125,500, though some was irregularly paid in. There is nothing to show the enterprise was entered upon or prosecuted with a fraudulent purpose.

■ Nor is the Southern Brewing Company a mere instrumentality or "other pocket" for Arnold's main business of contracting. The two businesses were wholly unrelated. A typical case of such a subsidiary corporation is the Monte Carlo Distributing Co., as shown by this record. It was formed for the sole purpose of marketing the beer made by Southern Brewing Co. It was given a capital of only $1,000, furnished either by Arnold or Southern Brewing Co. Arnold held eight shares of the stock, the other two being qualifying shares. Yet this flimsy corporation was expected to buy and resell the output of Southern Brewing Company, and did handle about 80% of it, coming to owe about $80,000 to its parent by the time of bankruptcy. This subsidiary employed fifty to sixty persons, at heavy expense, and it is testified was not expected to make money but only to sell and collect for the beer. The $80,000 debt is really the excess price charged for the beer above what the competitive market and expensive distribution warranted, plus losses by uncollectible accounts which would likely have happened if Southern Brewing Company had sold its own beer. Monte Carlo was only an agency of Southern Brewing Company, its assets and liabilities are really those of Southern Brewing Company, and a bankruptcy court could so hold. On the other hand, Southern Brewing Company is an independent enterprise doing its own business, on a substantial capital; and its being owned by one man does not destroy its separate existence.

■ We do not find any such mismanagement as would compel disregard of the corporate entity as a remedy against injustice. Six percent dividends taken in a period of prosperity as interest on the informal capital is not mismanagement. The salaries taken, not by any formal provision therefor in by-laws or directors' meetings, are reviewable. The allowance of $25,000 for one of the years is now under contest by the income tax authorities. If excessive, the excess can be ordered paid back, which will remedy any wrong done thereby. But Arnold's voluntary writing off of salary claims when the company did an unprofitable business shows no fraud or overreaching was intended. There was no purpose thus to "milk" the business at the expense of creditors, and no salary claims are now asserted.

In both Taylor v. Standard Gas Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, and Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, extravagant salary claims were prominent. A salary debt was the entire claim of the controlling stockholder in the latter case, and so-called salaries to a subsidiary corporation were large items in the mismanagement in the former. While an extensive review of the authorities was made in the Pepper case, with a classification of them as to the remedies applied, there was no specific approval of any, but only a decision of the case before the court. Gross mismanagement in it and the Standard Gas case was found to require in equity a postponement of the stockholder's claims to those of other creditors, no more accurate remedy for the mismanagement appearing to be practical.

■ We therefore hold that Arnold's advances in 1933 and 1934, before the taking of the security deed, were capital contributions and the interest payments on them were dividends. So to hold is a just and proper disposition of them. By consequence they cannot be secured as debts as against creditors. So much thereof as was actually returned in 1935 or

1936 while the capital was unimpaired and the corporation prosperous may probably be retained: See Kaminsky v. Phinizy, 5 Cir., 54 F.2d 16. But what had not been repaid, though the trust deed note promised payment, cannot be gotten back after the corporation's failure; Robinson v. Wangemann, 5 Cir., 75 F.2d 756.

 The advances made in 1937 and 1938 were valid debts secured by the recorded trust deed. A corporation may validly borrow money on security from its stockholder and officer, subject to scrutiny as to the fairness and good faith of the transaction. Zorn v. Brooks, 125 Tex. 614, 83 S.W.2d 949. That the lender dominates the corporation opens the transaction to closer examination; it does not ipso facto invalidate it. We find here no proof of mala fides, or that the money was not fully paid to and used by the corporation in an honest effort to carry on its business.

The foreclosure sale ought not to cut off the equitable adjustment of the rights of other creditors of the bankrupt, and should be set aside.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.