In the Matter of LICO MANUFACTURING CO., Inc., Debtor.

No. 29528.

United States District Court
D. Connecticut.

Dec. 29, 1961.

Arthur C. Williams, Marsh, Day & Calhoun, Bridgeport, Conn., Paul C. Jamieson, Stamford, Conn., for trustee.

I. J. Cohn, Bridgeport, Conn., for Milton I. Cohn.

ANDERSON, Chief Judge.

Lico Manufacturing Co., Inc. is presently in reorganization proceedings under Chapter X of the Bankruptcy Act, 11 U. S.C.A. § 501 et seq. The Trustee has moved this court either to invalidate certain indentures and a chattel mortgage or to subordinate the claims represented by these instruments to the claims of all other creditors. The Trustee's position is that these transactions were usurious under Connecticut law and should be invalidated or that they were entered into solely for the benefit of the indenture-chattel mortgage creditor, who also exercised a proprietary control over the affairs of the debtor thereby making it inequitable to give priority to these claims.

The facts out of which these issues have arisen are summarized in narrative form. Prior to February, 1953, Ira Pace was the sole stockholder and managing officer of Black Rock Manufacturing Company, hereinafter referred to as old Black Rock. For some time prior thereto he had, purportedly for reasons of failing health, been seeking a buyer for his interests in old Black Rock. Armand J. Ledoux had been employed by a firm which had done accounting work for old Black Rock for several years. He was familiar with the affairs of old Black Rock and assisted in the search for a buyer. He was also interested in acquiring the properties for himself. When the search for a buyer proved unsuccessful, Ledoux submitted several written proposals for purchase of Pace's stock which Pace rejected. However, in January, 1953, Ledoux submitted a written proposal for purchase which became the basis of the final agreement.

This agreement, arrived at in February, 1953, provided that Ledoux was to purchase all the stock of old Black Rock from Pace for $215,000, payable $25,000 in cash and a note for $190,000 at 6% interest. The note was to be paid in installments of $50,000 on or before March 1, 1953; $50,000 on or before April 1, 1953; and $90,000 on or before July 1, 1953. As part of the overall plan to acquire old Black Rock, Ledoux created two new corporations, Lico Manufacturing Co., Inc. and The Black Rock Manufacturing Company, hereinafter referred to as new Black Rock, each of which was capitalized at $1,000. Ledoux paid in the stated capital of the two new corporations and, except for a few qualifying shares held by nominees, became the sole stockholder of these two corporations. Ledoux then sold the shares which he had just acquired in old Black Rock to Lico for the purchase price of $215,000, which was represented by a note at 6% interest and payable $50,000 on or before March 1, 1953; $50,000 on or before April 1, 1953; $90,000 on or before July 1, 1953; and $25,000 on or before August 1, 1953.

Having acquired all the outstanding shares of old Black Rock, Lico proceeded to liquidate the old corporation by withdrawing all its stock and transferring its operating assets to new Black Rock, but retaining in Lico the land, buildings, machinery, and patent rights. The land and buildings were leased to new Black Rock for $12,000 per annum and the machinery for $24,000 per annum. New Black Rock thus became the operating company and Lico the realty company. Both are presently in reorganization.

As security on his note to Pace, Ledoux pledged the stock of the two new corporations and assigned Lico's note for $215,000. The stock of the two corporations was also placed in a voting trust better to secure Pace's investment. The trustees were Ledoux and two attorneys for Pace, Milton and I. J. Cohn. Pace also continued to be employed as a consultant in policy matters by new Black Rock at an annual salary of $20,000; he was given the services of a secretary, a company car and a boat for entertaining customers; he was paid travel expenses and given a credit card for the company car; the corporation paid for his country club dues, his group hospitalization benefits, and the premiums on group life policies. The continued employment of Pace and the creation of the voting trusts were considered by both Pace and Ledoux to be part of the arrangement by which Ledoux acquired old Black Rock.

Before the arrangement could be consummated, however, one particular obstacle had to be overcome. This was a restriction on the sale of old Black Rock stock contained in an obligation owing to Manufacturers Credit Corporation by old Black Rock in the amount of $63,000. It was therefore agreed that some sort of financing would be arranged whereby Pace would advance sufficient sums to Lico, which had assumed the obligation to Manufacturers Credit Corporation, to permit repayment of the obligation and thereby avoid the prohibition on the sale of stock. It was recognized at the time the sale of stock was completed that this debt would have to be paid very shortly after March 1, 1953. It was also recognized that Lico would have to pay $50,000 on its note to Ledoux at the same time.

The necessary financing was effected through the issuance of debentures by Lico to Cohn, as trustee for Pace, which were secured by a trust indenture, in effect, a mortgage on real property of the corporation. The total issue was in the face amount of $60,000 and was purchased by Pace for $45,000. The debentures called for interest payments at the rate of 1% per month. Simultaneously Lico mortgaged to Cohn, as trustee for Pace, all its machinery, office equipment, and a motor vehicle for $30,000. Pace loaned Lico $30,000 on this chattel mortgage note which provided for interest at the rate of 12% per annum. Ledoux testified that, though the details were left to be worked out, both the debentures and the chattel mortgage were a part of the plan of purchase of the old Black Rock stock by Ledoux.

In June 1953 Lico issued a second series of debentures to Cohn, as trustee for Pace, and executed a trust indenture for certain real estate securing the debentures. The total issue was for the face amount of $50,000 though Pace actually paid only $35,000 to Lico for these debentures. As with the first issue, the second issue was to pay interest at the rate of 1% per month. The $15,000 discount on each issue was a bonus.

Lico made two payments of $50,000 each on its note to Ledoux at the times indicated in the note. Ledoux in turn made two payments of $50,000 each to Pace in accordance with his note to the latter. However, as a result of business reverses occasioned by the cessation of hostilities in Korea, Lico failed to make the $90,000 payment required by the terms of its note to Ledoux to be paid on or before July 1, 1953. Ledoux was therefore unable to meet his obligation under the terms of his note to Pace. Ledoux, however, was paid $25,000 by Lico to cover the last payment due under the terms of its note to him. It was Ledoux' recollection that this payment was made before either of the notes went into default. At the time of Ledoux' agreement with Pace, they both contemplated that very likely Lico might not be able to make the $90,000 payment when it became due.

Though Pace was in a position to foreclose on the security in August, he took no legal action until December, 1953. At that time he considered foreclosure but no such action was ever prosecuted to a conclusion because Ledoux entered into an agreement with Pace whereby Ledoux was released from his $90,000 indebtedness in return for the complete assignment of his stock in Lico and new Black Rock and of his rights in Lico's note to him. Thus, within less than one year from the time he had disposed of his interests in old Black Rock, Pace became the controlling shareholder in the two new corporations and was in possession of Lico's defaulted note as well as its debentures and chattel mortgage. It is these debentures and chattel mortgage which the Trustee now moves to have invalidated or subordinated to the claims of other creditors.

In 1956, Ira Pace having died in the interim, Ledoux acquired 45% of the new Black Rock stock and of the Lico stock from the Pace estate. He acquired the remaining 55% of the shares in both corporations in 1959. As part of these transactions, Ira Pace's son, Benson, was placed on the payroll, though he continued to be employed full-time by another firm; and the widow of Ira Pace was granted a weekly stipend for life. Ledoux was therefore the sole stockholder in Lico at the time these reorganization proceedings were commenced. The beneficiaries of the Pace estate agreed to accept $100,000 in full settlement of the principal and interest on the indentures and chattel mortgage notes if paid by May 4, 1971.

*Discussion*

The Trustee claims that the debentures and the chattel mortgage and the notes which they secure should be invalidated as being contrary to the usury statutes of the State of Connecticut. Though the chattel mortgage does represent the full amount which was supposedly loaned under it, the Trustee takes the position that the issuance of the first series of debentures and the giving of the chattel mortgage did not merely occur at the same time but were, indeed, part of one unified transaction and, therefore, the chattel mortgage is not immune from attack in this proceeding. He insists that the court must appreciate the fact that what was contemplated by the parties was a loan of $75,000 in return for obligations whose face amount totalled $90,000. No real reason has been advanced by the holders of these obligations which would rebut the Trustee's argument. Though it has been shown that two separate checks were drawn for the amounts loaned under the two obligations and though Ledoux testified that the parties to the transaction attempted to treat the loans as two separate transactions, there has been no showing that the amount represented by the chattel mortgage was intended for one purpose while the sum re-

ceived in return for the debentures was slated for some different use. Nor has any other explanation been supported by the evidence adduced at the hearing. While it may be of little practical significance in light of the court's ultimate disposition of Trustee's petition, the conclusion is inescapable that both the debentures and the chattel mortgage represented one transaction, the broad outlines of which were planned by Pace and Ledoux at the time of the agreement for the sale of the old Black Rock stock.

With regard to the Trustee's claim that the obligations are invalid under Connecticut law, it is assumed that the Trustee relies on the provisions of § 70, sub. e(1) of the Bankruptcy Act as his authority for raising this defense to the claim for allowance. That section provides:

"A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this Act which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."

The rights and powers granted a trustee under § 70 are available to a trustee in reorganization proceedings under Chapter X of the Bankruptcy Act. See § 102 of the Bankruptcy Act and 4 Collier On Bankruptcy (14th ed., 1959) ¶70.69[3], pp. 1517–1518. Respondent asserts that under § 70, sub. e there must have been one creditor at the time of the transaction who continued as such until the institution of bankruptcy proceedings. However, the cases which are cited in support of this proposition each looked to state law in imposing this condition but there is no such requirement under the Connecticut cases.

It, therefore, becomes unnecessary to determine whether the United States, having disallowed certain depreciation allowances claimed by Lico on the basis of stepped-up values placed on old Black Rock assets at the time of transfer, is such a creditor.

The applicable provisions of Connecticut law under this prong of the Trustee's attack are § 37–4, § 37–5, and § 37–9 of the Connecticut General Statutes (Rev. 1958). § 37–4 provides that:

"No person and no firm or corporation or agent thereof, other than a pawnbroker as provided in section 21–44, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum."

§ 37–5 further provides:

"No person and no firm or corporation, or agent thereof, shall, with intent to evade the provisions of section 37–4, accept a note or notes for a greater amount than that actually loaned."

§ 37–9, however, contains the following proviso:

"The provisions of sections 37–4, 37–5 and 37–6 shall not affect any loan made prior to September 12, 1911, nor any loan made by any national bank or trust company incorporated under the laws of this state * * * nor any bona fide mortgage of real property for a sum in excess of five thousand dollars. * * *"

Though there are no Connecticut cases on all fours with the present case, there is no doubt that obligations bearing the earmarks of an usurious transaction can be voided. Contino v. Turello, 101 Conn. 555, 126 A. 725 (1924). And this is true though the lender originally had no intention of violating the usury statutes. Ibid. On the other hand, the Contino case also suggests that, where circumstances warrant, the remedy to be applied would not be complete invalidation of the obligation but simply a limitation of recovery to the amount actually loaned. Contino v. Turello, supra, at p. 561, 126 A. 725.

■■■ It is not necessary to show a specific intent to violate the statute in order to void an usurious transaction. If, in fact, there was an intent to exact interest at a rate which was usurious in fact and in law, there need be no showing of an intent to violate the statute. Atlas Realty Corp. v. House, (1937), 123 Conn. 94, 102, 192 A. 564. Under certain circumstances bonuses, though effectually raising the interest charged to a rate ordinarily deemed usurious, will not invalidate the obligation. Thus, if the services provided by the lender in arranging the loan justify additional compensation, the bonus will not brand the transaction an usurious one, Douglass v. Boulevard Co., 91 Conn. 601, 100 A. 1067 (1917); or where the situation of the borrower is such that a risk greater than sound business judgment would ordinarily warrant, the lender might be entitled to additional compensation in the form of a bonus, Cohen v. Mansi, 113 Conn. 91, 93, 154 A. 160 (1931). Nonetheless, if there is no showing of a satisfactory reason for the bonus, the transaction will be held void as usurious. Bochicchio v. Petrocelli, 126 Conn. 336, 11 A.2d 356, 127 A.L.R. 457 (1940). In the case at bar there has been no clear showing that Pace's services in securing the required sums for Lico were so valuable as to justify the provision for a bonus. There was some evidence tending to show that if bank financing was not impossible at the time, it was at least not as readily available as Pace's cash. This latter fact, however, was merely the result of the deal which Pace arranged for the sale of his stock in old Black Rock to Ledoux.

■■ Respondent argues that § 37–9 excepts bona fide mortgages of real estate from the operation of the usury statutes, that the indenture of trust securing the debentures is a real estate mortgage and therefore the issuance of the debentures for an amount greater than that actually received did not violate the usury statutes. The trouble with this assertion is that any mortgage loan involving a bonus *must*, as to the bona fide nature

of the bonus, be reviewed by the court in equity on foreclosure; for this reason the debt alone cannot be the subject of an action at law.

Atlas Realty Corp. v. House, 120 Conn. 661, 183 A. 9 (1936), was an action on two promissory notes. Both notes were secured by mortgages and both were given for amounts less than shown on the notes. A demurrer to the answer was sustained on the ground that the usury statutes did not apply to a bona fide mortgage of real property for an amount greater than the statutory minimum. On appeal the decision of the trial court was reversed and the case was remanded with directions to overrule the demurrer. The court explained that the exception permitting bonuses in bona fide mortgage transactions was made in reliance upon the certainty that an equity court in an action of foreclosure on a mortgage which included a bad faith bonus would, if not voiding the mortgage entirely for being usurious, reduce the amount required for redemption to that which would be equitably due and payable. The court stated that the statutory exception applied to bona fide mortgages and that bona fide connotes "good faith without fraud or deception; that is, good faith and honesty as distinguished from bad faith." Id. at p. 671, 183 A. at p. 13, quoting from M. Lowenstein & Sons v. British-American Mfg. Co., 7 F.2d 51, 53 (2 Cir.1925).

■ It is apparent that the Connecticut courts approach the problem from the standpoint of the equities involved. While a mortgage is presumed to be valid until its invalidity is proven, First National Bank of Bridgeport v. National Grain Corp., 103 Conn. 657, 131 A. 404 (1925), and the mere fact that the payment of a bonus results in a rate of interest greater than the maximum allowed by statute does not, of itself, affect the bona fides of a mortgage, Bridgeport Mortgage & Realty Corp. v. Whitlock, 128 Conn. 57, 20 A.2d 414 (1941), the bona fides of the mortgage determine whether it falls within the exception, Cohen v. Mansi, supra; Atlas Realty Corp. v.

House, supra. Here it is clear that Ira Pace, though declining to share in the risks of a shareholder, made certain that control of the corporation would be in his hands while maintaining his position as a preferred or secured creditor. The transactions here in question were not arm's-length dealings.

■ What makes a bonus bona fide and equitable is the existence of some consideration in rendering services, adding new capital which could not otherwise be acquired or furnishing some other benefit to the mortgagor, which in this case was Lico. But one must search in vain for any good to Lico emanating from the complex transactions engineered by Pace. The governing purpose of the arrangements was to benefit Pace. As the Trustee asserts " * * * Pace managed to extract the major portion of his capital from the old Black Rock Manufacturing Company and attempted to transform this capital into secured advances to the new corporations in such fashion that he was either bound to be repaid with a handsome bonus if the corporations succeeded or to reacquire the stock of the new corporations if they should fail." Meanwhile, he maintained through his attorneys, who dominated the voting trust, a proprietary control over the company and arranged for himself a substantial salary and innumerable side-benefits. The facts and circumstances surrounding the bonus provisions in question show such inequities with regard to corporate creditors that the bonuses cannot be found to qualify under the exception in § 37–9 of the Connecticut statutes.

■ However, state law alone is not ultimately determinative of the rights of the parties; federal law must also be considered. As the court said in Arnold v. Phillips, 117 F.2d 497, at 500–501 (5 Cir. 1941):

"We are of the opinion that in a bankruptcy case the ownership of property depends ordinarily on the State law, and so does the existence of a debt and the validity of the security for it. The inquiry begins in State law, but does not end there. Whether when bankruptcy supervenes a title acquired by one creditor is good against other creditors, and what are the relative rights and standing of creditors as against each other, and what the propriety of recognizing and enforcing secured debts under varying circumstances, are questions so related to the bankruptcy power as to be regulable by Congress; they are of the essence of bankruptcy law. There necessarily arises also a body of judicial interpretation having the effect of law, which overrides the interpretations of the State courts on similar questions. The 'equity' administered in the bankruptcy courts may not be exactly that of the State courts."

The court also held in that case that it need not investigate an alleged peculiarity of the state law since "in bankruptcy the reality and honesty of every secured debt may be investigated." Id. at 501.

In the leading case of Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) the United States Supreme Court considered the problem created by dealings between the directors, officers, or shareholders of the debtor and the debtor. The Court laid the burden of showing the fairness of such transactions, when challenged, upon those occupying such status. At pages 306–308, 60 S.Ct. at pages 245, 246, the Court said:

"The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. * * *

* * * * * *

"/T/he bankruptcy court in passing on allowance of claims sits as a court of equity. Hence these rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy. In the exercise of its equitable jurisdiction the bankruptcy court has the power to

sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. That is clearly the power and duty of the bankruptcy courts under the reorganization sections."

It was also pointed out by the Court in Pepper v. Litton, supra, that loans or advances made by dominant stockholders were to be subordinated to the claims of other creditors and treated in effect as capital contributions, particularly where the paid-in capital was purely nominal. In the case at bar, all of the transactions through and including the trust indentures and chattel mortgage were dominated and dictated by Pace. When he had acquired all of the stock of Lico, on threatening a foreclosure action, the debt became an obligation of the corporation owed to a dominant stockholder.

▮ The court concludes that payment of the bonuses under the circumstances of this case would be inequitable and should be disallowed. Moreover, equity requires that the obligations under the trust indentures and the chattel mortgage, exclusive of the bonuses, be subordinated to the claims of other creditors.

In the case of Heiser v. Woodruff et al., 327 U.S. 726, at 733, 66 S.Ct. 853, at 856, 90 L.Ed. 970 (1946) in speaking of the powers of the bankruptcy court, the Supreme Court said:

"In appropriate cases, acting upon equitable principles, it may also subordinate the claim of one creditor to those of others in order to prevent the consummation of a course of conduct by the claimant which, as to them, would be fraudulent or otherwise inequitable."

Also see Carter v. Bogden, 13 F.2d 90 (8 Cir. 1926).

▮ The obligations evidenced and secured by the two series of debentures and the chattel mortgage are to be allowed by the Trustee to the extent of the amounts actually loaned plus interest at the rate provided respectively in each of the instruments, less those amounts heretofore paid by the debtor. Further, these claims and the payment of them are hereby ordered to be subordinated to the claims and the payment of the claims of all other creditors.