In the Matter of TRANSYSTEMS, INC., Bankrupt.

FRUEHAUF CORPORATION, Appellant,

v.

Phillip REVITZ, Trustee in Bankruptcy, Transystems, Inc., Bankrupt, Appellee.

No. 76–2524.

United States Court of Appeals, Fifth Circuit.

March 24, 1978.

Rehearing Denied April 25, 1978.

John L. Zavertnik, Bayard E. Heath, Miami, Fla., for appellant.

R. Benjamine Reid, Carl H. Hoffman, Miami, Fla., for appellee.

Before COLEMAN and FAY, Circuit Judges, and KING,* District Judge.

JAMES LAWRENCE KING, District Judge:

On this appeal, appellant Fruehauf challenges the District Court's determination that the funds advanced to a corporation prior to the time of its bankruptcy were a contribution to capital of the bankrupt cor-

* District Judge of the Southern District of Florida, sitting by designation.

poration rather than a loan. In addition appellant challenges the district court's conclusion as to the creation of a security interest in the collateral underlying that advance. The court finds that the district court was correct in its conclusions on both issues.

While the background of this matter is complex, it is essential to an understanding of the decision of this court. Because of its integral quality, it is recounted in detail.

The bankrupt, Transystems, Inc., was organized in 1960. In February of 1969, Aero, Inc. acquired Transystems. At this time, an agreement was reached providing for a plan of reorganization. This agreement was preceded by a resolution of Aero's Board of Directors to authorize the purchase of up to $400,000 additional stock in Transystems in order to infuse substantial capital funds into its sagging corporate structure. $240,000 of this resolved amount actually was provided.

This initial infusion of funds was not sufficient. Finding that Transystems was not heading toward a financial recovery, Aero agreed to the further advance of funds. Specifically, in August of 1970, Aero advanced $385,000 to the eventually bankrupt company. This advance was engendered by Aero's recognition that its subsidiary, Transystems, still was suffering financially. Its profits were not nearly as high as originally represented by Transystems.

This advance, which is at the center of this appeal, was structured as a loan agreement. It was payable on a demand basis with interest at fifteen percent per annum on the outstanding balance. Each advance toward the $385,000 figure was to be evidenced by a promissory note, secured in part by a chattel mortgage on all operating rights of the bankrupt and a chattel mortgage on all encumbered trucks, trailers, cars and other equipment of Transystems. Pursuant to this agreement, Transystems executed three promissory notes for a total of $385,000. Transystems pledged all of its remaining unpledged assets as security. A financing statement was filed by Aero on August 26, 1970 with the Secretary of State of Florida. Aero then obtained a loan, collateralized by guaranties and other assets supplied by Aero, from the Bank of North America.

The $385,000 advanced was required by Transystems to allay the mounting pressures of back taxes and past due claims of creditors. However, Transystems' obligation to one creditor, Fruehauf Corporation—the appellant herein—could not be satisfied fully by this advance.

Fruehauf had leased and sold trailers to Transystems, thereby becoming one of its major creditors. In September of 1970, having defaulted on some of these lease payments, Transystems entered into an agreement with Fruehauf whereby the date of payment was extended by the appellant in exchange for Aero's guaranty, as parent corporation, of Transystems' performance. This guaranty was secured by the collateral pledged to Aero by Transystems under the August 1970 loan agreement.

In essence, Aero pledged collateral that Transystems had pledged to Aero earlier that year.

Despite this arrangement, Transystems' condition continued to deteriorate, culminating in the filing of a voluntary Chapter Eleven petition in March of 1971. At this juncture, Fruehauf, the creditor, demanded payment from Aero pursuant to the September 1970 guaranty. Transystems was indebted to Fruehauf for over $200,000.

Aero, suffering from its own financial maladies, decided that it could not fulfill its obligation as guarantor. In May of 1971, Aero and Fruehauf entered into an agreement wherein Fruehauf promised not to sue Aero on the guaranty and Aero agreed to *assign* to Fruehauf the collateral taken by Aero from Transystems under the August 1970 loan agreement.

The Bankruptcy Judge rejected Transystems' voluntary application in bankruptcy. On October 18, 1971, Transystems was adjudicated bankrupt.

On February 8, 1973, in the course of the bankruptcy proceeding, the Referee denied Fruehauf's claim to those assets of the

bankrupt embodied in the assignment by Aero to Fruehauf in May of 1971. The Bankruptcy Judge concluded that the $385,-000 advanced by Aero to Transystems—the collateral for which was eventually assigned to Fruehauf in May of 1971—represented a contribution to Transystems' capital rather than a loan. This decision was critical to the priority Fruehauf would attain in Transystems' bankruptcy proceeding.

Fruehauf subsequently sought review of this determination in the United States District Court for the Southern District of Florida. On December 13, 1973, that court decided that the Bankruptcy Judge had utilized an incorrect standard in arriving at his determination of the "status" of the $385,-000 advance. Judge Eaton found that this bankruptcy case was governed by *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[1] Therefore, state law, not federal, was the proper criterion for judging the status of the $385,000 advance. The case was remanded with instructions to decide the pivotal status of the advance within the context of state law principles.

Fruehauf filed a Notice of Appeal in the Fifth Circuit which this court dismissed on August 24, 1974 because it was not ripe for appeal. 499 F.2d 416 (5th Cir. 1974). The case was remanded to the Bankruptcy Court to be decided pursuant to the instructions of the District Court in its order of December 13.

On remand, the Bankruptcy Court held that the advance in question was a capital contribution even under state law. Further, the Bankruptcy Court held that Aero—the party that made the advance in exchange for the collateral which served as the foundation for its subsequent guaranty to Fruehauf—had not created nor perfected a security interest in that collateral.

Finding that a determination of the status of the monetary advance was a question of fact, the District Court reviewed the Bankruptcy Judge's ruling thereon under the "clearly erroneous" rule. The Bankruptcy Judge's findings were affirmed.

After its petition for rehearing was denied by the District Court, Fruehauf filed this appeal.

Appellant raises three issues on this appeal:

(i) whether the District Court erred in choosing to utilize the "clearly erroneous" standard in reviewing the Bankruptcy Judge's determination as to the status of the advance in question?

(ii) whether the advance of $385,000 made by Aero to Transystems in August of 1970—the collateral attendant thereto being integral to Aero's May 1971 agreement with Fruehauf—was a valid loan or contribution to capital?

(iii) whether a security interest was created and perfected in the materials mentioned in the August 1970 loan agreement?

## 1. THE CLEARLY ERRONEOUS STANDARD WAS THE CORRECT CRITERION FOR REVIEW OF THE BANKRUPTCY JUDGE'S FINDINGS:

▌ The District Court utilized the correct criterion in assessing the Bankruptcy Court's determination of the status of Aero's advance to Transystems.

Rule 810 of the Bankruptcy Rules of Procedure requires the District Court to accept a Referee's findings of fact "unless they are clearly erroneous. . . ." Thus, it remains for this court to determine whether conclusions relating to the advance in question involved findings of law or findings of fact. If findings of fact were involved, then Rule 810 mandates the utilization of the "clearly erroneous" standard.

### A. *State Law Focusses on Intent as the Prime Determinant of the Status of the Advance:*

The District Court and Bankruptcy Court were bound to apply state law in the resolution of the substantive issues before them.

---

1. *See*, A. Hill, "The Erie Doctrine in Bankruptcy," 66 *Harv.L.Rev.* 1013 (1953).

While there is very little state law on the issue of the loan/capital dichotomy, one case—*Pierce v. Scott*, 142 Fla. 581, 195 So. 160 (1940)—is of great significance. It has received thorough scrutiny by both parties to this appeal.

A careful reading of *Pierce* reveals that in proceeding to a determination of the status of the stockholder's advance in that case, the court primarily focussed on the *intent* of the party that made the advance. This inquiry required the court to engage in an evaluation of the facts of the transaction itself—that is, the manner in which the advance was made and the circumstances surrounding it. The standards elucidated by that court as criteria to be utilized in the determination of the status of an advance substantiate this court's belief that a factual inquiry was at the center of the *Pierce* court's efforts:

> a stockholder or any other person connected with the management of corporate affairs can create the relationship of creditor and debtor as between himself and the corporation by making advances from his own personal resources to the corporation, where such advances are made for the benefit of the corporation and its stockholders and creditors, and where the transaction itself is entirely free of any fraud and bad faith, and where the person so making the advancement to the corporation obtains no advantage to himself over the other stockholders and creditors of the corporation.

*Pierce*, 195 So. at 161.

The *Pierce* decision proffers three categories of findings of fact that should guide a Bankruptcy Court in its determination of the status of a stockholder's advance. However, these three categories, as delineated in the above excerpt, do not define the limits of *Pierce*. This court believes that the "intent" of the advancing party underlies these three categories. Indeed, "intent" pervades the fabric of the entire *Pierce* opinion.

It is clear, from a careful scrutiny of the *Pierce* opinion, that the chancellor there had investigated the manner in which, and the circumstances under which, the advance was consummated in order to determine whether the bona fides of indebtedness had been established.

The predominant concern of the *Pierce* court was with substance, not form. In fact, that court expressly stated this to be the axion by which it was guided. *Pierce*, 195 So. at 162. To hold that *Pierce* established a rigid three part test for the determination of the status of an advance by a stockholder to his corporation would be to undercut the very thrust of the *Pierce* opinion. In effect, the three categories set forth in *Pierce* are points within an analytical framework. Implicit in each is an underlying concern with the advancer's purpose for promoting the advance. Connecting these three points is the skein of "intent". Intent is the substance which weaves the three into a coherent form.

Appellant Fruehauf does not cite any authority to support the contrary position.[2] Instead, it asserts that the primary facts adduced by the Bankruptcy Judge are not in dispute. The only dispute, it contends, is as to the application of Florida law to those facts.

This court cannot agree. True, the basic facts relating to the manner in which the transaction occurred are not in dispute. However, the ultimate fact of "intent" is hotly contested.

In essence, the conflict has centered on findings relating to Aero's intent. Fruehauf claims that the findings of fact as to intent are such that the application of *Pierce* thereto should result in the characterization of Aero's advance as a loan. The trustee asserts that the factual finding as to intent is such that application of *Pierce* compels the conclusion that Aero intended to provide a contribution to capital. Fruehauf does not deny that if the factual finding of intent is as the Bankruptcy Judge

---

2. It should be noted that the burden is upon *appellant* to demonstrate to this appellate court that the findings of fact of the referee in bankruptcy were clearly erroneous. *See, Martin v. Mercantile Financial Corp.*, 404 F.2d 886 (5th Cir. 1968).

has found, *Pierce* would mandate the result achieved.

### B. *Intent Entails a Finding of Fact*:

*Pierce* mandates that the intent of the parties be the paramount concern of the inquiry undertaken by the Bankruptcy Court. Whether an investigation into intent produces a finding of fact, thereby necessitating the invocation of the "clearly erroneous" criterion on review, is a matter regarding which there is a dearth of state law. Federal courts, however, have treated this issue repeatedly in the past.

In a former decision of this court involving the status of advances made to a subsequently bankrupt corporation, intention was equated with a finding of fact:

> There can be little doubt that what he contributed to the plant was actually *intended* to be capital . . . . The district court was justified in concluding *as a matter of fact* that the advances during the first year were capital, a sort of interest-bearing redeemable stock . . . . (emphasis added)

*Arnold v. Phillips*, 117 F.2d 497, 501 (5th Cir. 1941).[3]

More recently, in *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426 (5th Cir. 1977), Judge Morgan, speaking for the court, delineated the purpose of the "clearly erroneous" rule. In doing so, the court gave reason to believe that a finding of "intent" would be a finding to which the rule of clear error would be applicable, thereby suggesting that a finding of "intent" was a finding of fact. *Golf City* provided, *inter alia*, that the findings of fact to which the clearly erroneous rule apply

lie along a conceptual line from those termed "subsidiary" to those labeled "ultimate." For example, in the instant case a subsidiary fact might be that appellant Wilson notified Golf City on a certain date that Wilson would not sell Golf City proline golf equipment. An ultimate fact might be that PGA and the manufacturers conspired to prevent Golf City from obtaining pro-line goods. Ultimate facts generally are derived from subsidiary facts through a cause-effect reasoning process. That is, when subsidiary facts A, B, and C are shown to exist, then, because of the fact-finder's knowledge of the way the world works, he is able to conclude that, more likely than not, ultimate fact X also exists. He infers X from A, B, and C.

*Golf City*, 555 F.2d at 432–33. (emphasis added)

In *Golf City*, a suit concerning a conspiracy in violation of the antitrust laws, the "conceptual line" spanned from the subsidiary fact of an unwillingness to make a sale to the ultimate fact, premised thereon, of an intention to form a conspiracy in violation of the antitrust laws. In like fashion, the concept of a continuum of facts wherein ultimate facts are inferred from subsidiary facts describes the process engaged in by the Bankruptcy Judge in the case *sub judice*. In essence, Aero's intent to contribute to capital was inferred from the manner of and the circumstances surrounding the advance it made to Transystems. Thus, in assessing the correctness of the finding of ultimate fact embodied in "intent", the District Court was justified in utilizing the criterion of clear error.

Having established that a finding of fact was to be reviewed, thereby necessitating

---

**3.** *See, Rowan v. United States*, 219 F.2d 51, 54 (5th Cir. 1955), where this court held:

> whether an advance is a loan or is capital depends on *the intent* of the parties, and this intent is to be ascertained from all relevant *facts and circumstances.* (emphasis added)

A somewhat analogous situation is found in *Dowell v. United States*, 553 F.2d 1233 (10th Cir. 1977). There, plaintiff-appellant sought a refund of federal income tax. The court directed its attention to the *intention* of the taxpayer in making the gift which had given rise to the controverted tax. In explicating the posture it would assume on review of the lower court's conclusions as to the issue of intention, the court stated that a

> decision, then, as to intent or motive is one reserved for the finders of fact and it is not to be disturbed unless held to be "clearly erroneous." The appellate court may not so conclude unless, from a review of the entire evidence, it is convinced that a mistake has been committed.

*Dowell*, 553 F.2d at 1238 (cits. omit.).

the invocation of the "clearly erroneous" standard pursuant to Bankruptcy Rule 810, it remains for this court to consider the meaning of that standard in the context of a determination of the status of an advance.

### 2. THE COURT CORRECTLY UTILIZED THE CLEARLY ERRONEOUS STANDARD IN DECIDING THAT THE ADVANCE CONSTITUTED A CONTRIBUTION TO CAPITAL:

In an oft-quoted passage of *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947),[4] the Supreme Court declared that a finding of fact is clearly erroneous

> when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

There are several facts which strongly support the District Court's conclusion that the Bankruptcy Judge did not commit clear error in determining that Aero's intent was to provide a capital contribution by way of its advance to Transystems.

First, the promissory notes issued by Transystems in exchange for Aero's loan were payable on demand and did not possess a date of maturity. Significantly, no demand was made on these notes by Aero in the period between the day on which the advance was made and the day on which the voluntary petition in bankruptcy was filed.

Second, it is noteworthy that at the time Aero agreed to advance $385,000 to Transystems, Transystems was in particularly bad financial shape. Aero was aware of this. The Bankruptcy Judge's inference that no lender would have expected repayment of a loan under these circumstances is justified. Indeed, the expectation of repayment only could have been linked to the

recuperation of Transystems—a patient whose need for capital was painfully obvious. Immediately after the advance was made, Transystems, with assets listed at a book value of $2,000,000, had a net worth of *negative* $100,000.

That Aero must have been aware that the chance of repayment on such a loan was unconscionably low is supported further by Transystems' inability to procure a loan from a bank at that time. In the end, only the Bank of North America was willing to provide the funds that ultimately were received by Transystems and it did so only by constructing the transaction so that Aero was the direct recipient of the funds. In fact, the bank only agreed to the loan after receiving substantial guaranties and security from Aero—not Transystems. As the Bankruptcy Judge held, no outside lender would have provided funds to Transystems while it was "on the verge of closing down [and] when its line of credit had been withdrawn by its financing bank." (A. 344).

Third, the record reveals that at the time the February 1969 acquisition of Transystems by Aero was consummated, Aero's president indicated that the initial infusion of funds by Aero would be *capital.* In a letter from the president to all employees of Transystems, the president described Transystems as "a company with a potential for unlimited growth whose primary need is for adequate capital with which to finance this growth. Aerosystems can lend this support. . . ." (Tr.Ex. 14, A. 401). This letter is particularly significant in light of the fact that prior to the reorganization, Aero had adopted a resolution stating that it would "provide up to $400,000 of working capital" for Transystems. At the time the $385,000 advance at issue was made, only $240,000 had been provided. It would not be unjustified to infer from these occurrences that Aero recognized that Transystems was in further need of capital, even after the advance of $240,000. After that advance, Transystems' financial condition had only deteriorated.

---

**4.** The finding of fact involved in *Gypsum* related to whether the evidence had established that defendants associated themselves in a plan to blanket the industry under patent licenses and

to stabilize prices. The inference of concerted action was drawn on the basis of certain facts in evidence.

In connection with this, the Bankruptcy Judge noted that the term "working capital"—so prominent in the resolution adopted by Aero's Board of Directors—reflected Aero's recognition that Transystems was in dire financial straits and in need of further *capital* funds in order to keep it afloat. As the Bankruptcy Judge noted,

> [w]orking capital is the necessary 'turnaround' cash and other immediately convertible current assets that every business must maintain at a more-or-less fixed level, sufficient to provide for payment of payroll and other current expenses of operation. . . . It is clear Transystems had a substantial need for working capital on August 25, 1970. . . . [It] was on the verge of either closing down or filing a Chapter XI petition in the Bankruptcy Court. (A. 344).

Finally, the Bankruptcy Court was impressed by Aero's escalating involvement in the management and operation of Transystems. The agreements that constituted the $385,000 advance were signed by the President of Aero in that capacity *and* in the capacity of President of Transystems. Such increased participation in management further suggests that Aero's intent was to infuse further working capital into the sagging corporate structure of its subsidiary—not to provide a loan with the expectation of repayment in the near future. As this court noted in *Arnold* "that the lender dominates the corporation opens the transaction to closer examination" as to its status as a valid loan. *Arnold*, 117 F.2d at 503.

This court does not hold that the above circumstances preclude the possibility that Aero's advance was a loan. However, taken in conjunction with the fact that there were no indicia of a loan presented to the Bankruptcy Judge beyond the labels affixed to the documents themselves, these circumstances compel the conclusion that the District Court was correct in finding that the Bankruptcy Judge had not committed clear error in finding that Aero's intent was to provide a contribution to capital. In the end,

> what counts is the substance of the advance. If the funds have been advanced with reasonable expectations of repayment, they are loans; if as a matter of substantial economic reality they are risked upon the success of the venture, the funds are actually capital. The factors relevant to the determination of capital or loan include: the original debt-equity ratio, the lack of reasonable expectation of repayment, whether outside investors would make such advances, and the motives determining the form of the advance.

Herzog and Zweibel, "The Equitable Subordination of Claims in Bankruptcy," 15 *Vanderbilt L.Rev.* 83, 94–95 (1961).

It is clear that the Bankruptcy Judge's findings are in line with the above factors. It was not clear error to find that the *substance* of this transaction indicated an intention to contribute to capital instead of an intention to provide a loan, per *Pierce v. Scott.*

In fact, even utilizing the three point test of *Pierce* as appellant suggests—that is, independent of the overall framework of intent of which it is an inextricable part—this court believes that appellant confronts an insurmountable obstacle. The third point in that framework requires that the advancer not gain an advantage over the other stockholders or creditors of the corporation through the provision of the advance if it is to be deemed a valid loan. It is this requirement which appellant cannot satisfy.

There is no state law to guide this court in its construction of this third factor. However, federal courts have treated this issue in similar contexts and their opinions are of great help to this court herein. Indeed, the prior opinion of this court in *Arnold v. Phillips* suggests that should an advantage accrue to an advancer vis-a-vis *subsequent* creditors, as well as those precedent to the advance, such an advantage would not comport with the bona fides of indebtedness. *Arnold*, 117 F.2d at 501.

To conclude that Aero had created a loan at a time when it was well aware of the urgent need of its own subsidiary for working capital would be to imbue Aero with an undue advantage over its companion stock-

holders and creditors. Their share of the bankrupt's assets would be unduly diminished by such a finding. Such a finding would permit Aero the unwarranted luxury of treating its advance as a loan when the recipient suffers a terminal financial decline and as a contribution to capital when the recipient proceeds to a financial recovery.

Contrary to appellant's assertion, our finding herein will not wreak havoc with the expectations of those parties seeking to make advances at some time in the future. Instead, it will place them on notice that they will not be permitted to utilize ambiguity in order to hedge their bets. Our actions herein are not those of the proverbial "Monday Morning Quarterback." Rather, this court has approached this problem by scrutinizing the subsidiary facts of this transaction as of the time the transaction occurred.

Because the advance was a contribution to capital and not a loan, there is no need for this court to consider whether a security interest was created and perfected in the collateral assigned to Fruehauf in May of 1971.